THE STATE v. ANDERSON LOGAN, Appellant.—111 S. W. (2d) 110.

Division Two, December 17, 1937.

*Don C. Carter* for appellant.

*Roy McKittrick*, Attorney General, and *Wm. Orr Sawyers*, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant, a negro, was convicted of murder in the first degree in the Circuit Court of Callaway County on change of venue from Boone County, and his punishment fixed by the jury at death. On this appeal his assignments of error are directed to the selection of the jury which tried him, and to the giving of two instructions. His main contention is that negroes were deliberately excluded from the list of thirty talesmen summoned by a deputy sheriff, from which the jury was drawn, in violation of his rights under the Fifth and Fourteenth Amendments of the Constitution of the United States and Section 30, Article II, Constitution of Missouri, and the holding in the "Scottsboro case," Norris v. Alabama, 294 U. S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579.

As to the homicide, the State's evidence was clearly sufficient to support the verdict. The statement of facts in appellant's own brief, summarizing the evidence, shows that he shot and killed his wife, Angela Logan, with a shotgun in broad daylight on the streets of Columbia, and also fired at a fleeing negress who was with her. Both of them were within the peace at the time. The appellant was incensed because his wife had sued him for divorce, and thought others had intermeddled in their affairs.

The issue on the selection of the jury stands out prominently in the record. After both sides had announced ready for trial the prosecuting attorney proceeded to interrogate concerning their qualifications as jurors a special venire of thirty talesmen who had been summoned for jury service in the cause by the sheriff under an order of the court made over three weeks before. Counsel for appellant elicited the fact that all these men had been summoned on the special venire and then challenged the array because no members of the regular panel for that term of court had been called. This objection was overruled, counsel for appellant refused to examine the talesmen further, and all thirty were accepted on the panel. The court then directed counsel for the respective parties to make their peremptory challanges, whereupon appellant's counsel asked for time to prepare a motion to quash the panel, stating he had already prepared a motion to quash the regular panel, which he had supposed would be called, but could not use it since all the members of the panel were talesmen. He disclosed his objection would be that negroes had been discriminated against in the selection of the panel.

The court was about to overrule the request on the ground that the order for the special venire had been made over three weeks before and counsel for appellant had announced ready for trial, and

then asked counsel for the State if they objected to the filing of the motion. They answered that they did not object, and said "We will take it up when we see it, and see what it is." Thereupon the court gave counsel for appellant twenty minutes within which to prepare and file the motion.

The motion to quash the panel assigned the following reasons:

"That the deputy sheriff of Callaway County, Missouri, in the selection and summoning of the aforesaid venire of thirty (30) men unlawfully discriminated against the defendant, in violation of the Fourteenth Amendment to the Constitution of the United States of America in that he arbitrarily selected all white citizens and did not select or summon any negroes to sit as jurors in said case, although there are many hundreds of legally qualified negroes resident of Callaway County, Missouri, who are qualified to sit as jurors in the trial of cases, both civil and criminal, in the Circuit Court of Callaway County, Missouri."

In support of the motion appellant first called as a witness, J. C. Owen, the deputy sheriff who summoned the special venire. He said the selection of the talesmen was left to him. His further testimony was as follows (italics ours):

"Q. Mr. Owen, will you tell the Court why in the selection of the thirty men you chose only white men and no negroes? A. I have got good citizens, within the borders of Callaway County,—citizens who have not been challenged, so far as I know.

"Q. Well, there is no question but what these men are all good citizens. A. Yes, sir,—or they would not be on that list.

"Q. But I am asking why, in the selection of this 30, didn't you get some negro men? A. The order calls for thirty good men.

"Q. Are there any good negro citizens in Callaway County? A. I haven't made that a study.

"Q. Would you say that there weren't any? A. No,—I haven't made that a study.

"Q. Would you say that there were not any good colored citizens eligible to jury service in Callaway County? A. I don't think I am qualified to answer that.

"Q. Will you give me your reason why you never attempted to select any negroes to sit in the trial of this case?

"Mr. Sapp: We object to that. The Court: Objection sustained. He has not said that he attempted not to,—he said that he went out and got thirty good men. (Exceptions saved.)

"Mr. Carter: Q. Could you tell us, or will you tell us why, in the selection of thirty good men you didn't get some negroes?

"Mr. Sapp: He has answered that by saying that he went out and selected thirty good men.

"The Court: You may answer whether or not you made any

discrimination according to names and color, or whether you went out and got thirty good men that you came in contact with,—Mr. Sheriff, did you make any discrimination in selecting the thirty men, because of their race, or color, or did you go out and select thirty good men that you came in contact with,—which did you do?

"The WITNESS: A. I selected men that I thought were suitable for jury service, who had not been in court as felons, and men whose reputations were good. I aimed to get that kind, and always do, Your Honor. *I have not been in the habit of going out and getting negro juries,* and I don't know who would make good negro jurors.

"Mr. CARTER: Q. If, when you had gone out to get this panel of 30, there had been four or five good negro men sitting at your door, Callaway citizens, would you have selected one of them? A. Well, I can't say, because I am not qualified to say whether they would have made good jurors.

"Q. Would you have selected them— A. If I had known it?

"Q. Yes. A. *I don't think so.*

"Q. *Why?* A. *Well, that has not been the custom.*

"Q. How long have you been Deputy Sheriff? A. Well, I have been a Deputy Sheriff about two years and six months.

"Q. How long were you Sheriff before that? A. Four years.

"Q. I will ask you to tell this Court whether or not in all that period of time as Sheriff and Deputy Sheriff of Callaway County you ever selected a negro to sit as a juror? A. *No, sir.*

"Q. Why didn't you? A. Well, I could answer you better out of the courtroom.

"Q. Beg your pardon? A. *I could answer you better out of the courtroom. We haven't been raised that way, now,—to be plain with you.*

"Q. That is what I am getting at,—you haven't been raised that way? A. No, sir.

"Q. And when you selected the thirty to sit as jurors in this case you knew when you left your office you were not going to bring in any negro names on that list? A. I think I have just formerly stated my answer to that question.

"Q. Well, answer the question. A. *No, sir.*

"Q. You would not have. That is all.

"The COURT: Q. Mr. Sheriff, are there people of other nationalities in this county besides what we call 'Americans'—are there Germans in this county? A. Yes, sir.

"Q. And of other nationalities, too? A. Yes, sir.

"Q. When you go out—and when you went on this occasion did you inquire as to a man's nationality,—did you? A. I did not.

"Q. What I want to get at is this: You had in your hand a venire calling for thirty qualified men as jurors. Did you discrimi-

nate against Germans or Scandinavians or Negroes or anyone else,—
or did you go and select the thirty best men you could find?

"Mr. CARTER: I object—The witness: A. That is what I tried.
to do.. Mr. CARTER: I object to that question, because it leaves the
witness to determine whether he discriminated or not. That is a
question for the Court to pass upon. The COURT: The objection is
overruled (exceptions saved). The COURT: Any questions, gentle-
men? Mr. SAPP: No questions."

Next, appellant called Mr. Howard B. Lang, who had continuously
been official court reporter in Callaway County for twenty-six years.
He testified that during all that time he had never seen or known
of a negro being called for jury service in the county. He further
testified many negroes lived there who were of good moral character
and who stood well in their several communities; that there were
many such who were male citizens over twenty-one years of age,
sober and intelligent. He declined to express a conclusion as to
whether they would make good jurors.

The State offered no evidence on the motion and did not cross-
examine either witness. The court then called for suggestions from
both sides, and Mr. Sapp, prosecuting attorney of Boone County, who
was assisting Mr. Faucett, prosecuting attorney of Callaway County,
said:

"Mr. Faucett, representing Callaway County, and I have been in
conference on this matter with reference to whether the panel should
be quashed. As a matter of law, under the Scottsboro case, it is
very doubtful in our minds as to whether or not the Court will uphold
a conviction if obtained in this case. Primarily, it is a question for
the Court, and for that reason we will have to defer to the Court's
ruling on the matter."

Arguments were made by counsel on both sides. Appellant's
counsel conceded the thirty men on the panel were all good men.
Counsel for the State admitted the question was serious, and that
this court might be compelled to restate the law as declared in earlier
decisions, such as State v. Liston, 318 Mo. 1222, 2 S. W. (2d) 780 and
State v. Thomas, 250 Mo. 189, 157 S. W. 330, in view of the then re-
cent decision of the United States Supreme Court in Norris v. Ala-
bama, 294 U. S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579. But they con-
tended the so-called Scottsboro case was distinguishable from this be-
cause there the jury were members of a regular panel carefully
selected by commissioners corresponding to the county courts in the
rural counties of Missouri; and because appellant had answered
ready for trial and waited until after the special panel had been
qualified, to file his motion to quash. They asserted also that the
testimony of Deputy Sheriff Owen showed he had merely tried to get
thirty good, qualified men, and that he did not discriminate against

any race in making his selections. The trial court took that view and overruled the motion. The Attorney General stands on the same grounds here.

Appellant's counsel refused to make any peremptory challenges and the first twelve men on the list were empaneled and sworn. The cause was tried before them and they returned the verdict on which the judgment is based. Before the jury was sworn appellant objected to further proceedings in the cause before the jury for the same reasons theretofore specified. After the jury was sworn and the prosecutor had made his opening statement, but before any evidence had been introduced, appellant announced his refusal to participate in the trial for the reasons previously given. At the close of the State's case he again requested that the jury be discharged for the same reasons. Exceptions were saved to all these adverse rulings and the question is properly preserved in the motion for new trial.

We are clearly of the opinion that the cause must be reversed and remanded for another trial. The deputy sheriff who selected the special venire testified that it had not been the custom in Callaway County to summon negroes as jurors; that he did not think he would have selected negroes if he had known them to be good jurors; that in the six years and six months he had been sheriff and deputy sheriff he had never selected a negro for jury service. When asked why he had not he replied: "I could answer you better out of the courtroom. We haven't been raised that way, now, — to be plain with you." He also said that when he left his office to summon the venire he knew he was not going to bring in the names of any negroes on the jury list.

In answer to a further question by the court he testified there were nationalities in the county "besides what we call 'Americans,'" such as Germans and others; that when he went out to summon the jurors in this cause he did not inquire as to their nationalities; and in executing the *venire facias* he did not discriminate against Germans, Scandinavians, Negroes, or anyone else, but tried to select the best men he could find. But we do not take this testimony of the deputy sheriff as contradicting the specific and positive statements he made on direct examination. To do so would be to convict him of false swearing one time or the other, and clearly we cannot do that, because of his evident candor and his obvious high standing in the county. What he must have meant was that he did not discriminate against negroes in selecting the *best* men, because he did not consider or did not know that negroes would rank with the others for jury service. There can be no question about the fact that in selecting the talesmen he conformed to a long standing custom in the county.

Mr. Lang, the court reporter, said he had never seen or known of a negro being summoned for jury service in Callaway County

during the twenty-six years he had been in office, and it is clear from his testimony that there were negroes in the county who were fit for jury service—male citizens over twenty-one years of age who were sober, intelligent, of good reputation and otherwise qualified. [Sec. 8746, R. S. 1929, Mo. Stat. Ann., p. 4691.] Counsel for the State did not contend otherwise.

Neither do we think the action of the trial court in overruling the motion to quash the panel can be upheld on the ground that appellant's counsel failed to file it until after the panel had been qualified. He disclosed, when he asked for time to file the motion, that it would be directed to the sheriff's failure to summon any negroes for jury service, and the State's counsel expressly waived objection to its being filed at that time. And it is well that this case do not pass off on technical grounds, for whatever this court or the United States Supreme Court may have said in former decisions the "Scottsboro case," Norris v. Alabama, supra, 294 U. S. 587, 79 L. Ed. 1074, 55 Sup. Ct. 579, is now controlling authority in Missouri and must be followed by this court and all other State courts.

In the motions to quash the indictment and the trial venire in the Scottsboro case the charge was "of long-continued, systematic and arbitrary exclusion of qualified negro citizens from service on juries, solely because of their race and color, in violation of the Constitution of the United States." The United States Supreme Court declared in the opinion:

"Whenever by any action of a State, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. . . . The principle is equally applicable to a similar exclusion of negroes from service on petit juries. (Citing cases.) And although the State statute defining the qualifications of jurors may be fair on its face, the constitutional provision affords protection against action of the State through its administrative officers in effecting the prohibited discrimination."

The facts in the Scottsboro case, though more detailed than those here, make it controlling. The indictment was found in one county and the case was tried in another on change of venue. The evidence showed the male population over twenty-one years of age in the county where the indictment was returned was 8801, of which 666 were negroes. For a long number of years no negro had been called for jury service in that county. Witnesses whose ages ran from fifty to seventy-six years testified no negro had served on any grand

or petit jury in the county within their memory. This testimony was supported by that of officials. The court reporter who had not missed a session of court in twenty-four years spoke to the same effect, as did two jury commissioners. The United States Supreme Court said: "That testimony in itself made out a *prima facie* case of the denial of the equal protection which the Constitution guarantees." The names of negroes on the jury roll were marked "col." There was more testimony in the Scottsboro case than here as to the number of negroes in the county who were qualified for jury service. It was shown that there were thirty or more negroes who were thus qualified and who were members of school boards, or trustees of colored schools, and property owners and householders. Some negroes in the county had been called for jury service in the Federal courts.

In the county where the case was tried the total population was 46,176 of which number 8,311 were negroes. Within the memory of old residents no negro had ever been called for petit jury service. The circuit clerk said that during his four years of service 2500 persons had been called for jury service, none of whom were negroes. There was testimony that there were 200 negroes in the county who were qualified, including business men, owners of property and householders. This evidence was practically undisputed.

Further it is true that the selection of the regular jury panel in the Scottsboro case was attended with more elaboration. The jury roll was required by statute to contain the names of all male citizens of the county over twenty-one and under sixty-five years of age, their occupation, place of residence and place of business. Negroes were not excluded from this general list, but none were on, or ever had been on, the panel for any term of court. In the instant case the special venire was chosen by a more informal and direct method. The deputy sheriff simply went out and summoned thirty talesmen from the body of the county. But in view of his testimony it is just as clear as in the Scottsboro case that negroes were intentionally and systematically excluded. The State did not dispute at the trial and does not dispute now that there were negroes in the county who would have been qualified for jury service.

There is one point which we feel we ought to make clear. The motion to quash the panel charges that the deputy sheriff in the selection of the special venire unlawfully discriminated against the appellant in violation of the Fourteenth Amendment "in that he arbitrarily selected all white citizens and did not select or summon any negroes to sit as jurors" in this case. It is not the law that the appellant was absolutely entitled to have negroes on the jury that tried him, or even on the panel from which that jury was drawn. It may happen that no negroes (or members of any other particular class of our citizens) will be on the regular panel for a given term of

court, or on the special venire for a particular case.  If that occur in due course and good faith because of the ratio of white to negro population, or because of actual disqualifications, pure chance or the like, it is within the law;  but if the defendant be deprived by design of the *chance* of having negroes on the jury which is to try him, the Federal Constitution may be invoked.  The fact that no negroes were drawn in the particular case is not conclusive against the State;  and the fact that negroes might not have been drawn in due course is not conclusive against the defendant.

It was held in State v. Thomas, 250 Mo. 189, 203, 157 S. W. 330, 334, that evidence showing there are numerous negroes in the jurisdiction in all respects qualified for jury service but that none of them have ever been drawn for such service is immaterial, because the question is not what has been done in the past but is whether discrimination operated in the drawing of the particular jury involved. But the Scottsboro case holds in effect that proof of such a practice long continued is *prima facie* evidence of intentional exclusion in the particular case;  and that far, we think, it overrules or limits the Thomas case.

No question was raised by counsel for the State in the circuit court, and none is raised by the Attorney General here about the sufficiency of appellant's motion to quash to invoke the principle decided in the Scottsboro case.  On the contrary the position of the State's counsel throughout has been that it does at least raise the question. .

Other points are presented in appellant's brief but we need not discuss them in view of the result reached.  For the reasons given the judgment is reversed and the cause remanded.  All concur.