STATE v. VAN LEE RAMSEY, Appellant.—No. 39998.—197 S. W. (2d) 949.

Court en Banc, November 11, 1946.

Rehearing Denied, December 9, 1946.

*Silas E. Garner* for appellant; *Wm. H. Hutchinson* of counsel.

*J. E. Taylor,* Attorney General, and *W. Brady Duncan,* Assistant Attorney General, for respondent.

722

HYDE, J.—Defendant was convicted of murder in the first degree and sentenced to death. He has appealed from the judgment imposing this sentence.

Defendant was found guilty of the murder of Lena A. Davidson by stabbing her in the throat while attempting to rob her. Miss Davidson,

nineteen years old, was employed as a waitress in a lunch room at Grand Avenue and Natural Bridge Avenue in St. Louis. She worked from 4:00 P. M. to 1:00 A. M. On the morning of May 1, 1945, after finishing work, she boarded a street car there, about 1:27 A. M., and rode to Grand and Meramec. She got off the car there to go to her room on 37th Street, walking alone to the corner of Osceola and Grace Avenues.

Mrs. Iza L. Bishop, who lived at 4328 Grace (on the corner) and Arthur J. Krings, who lived at 4312 Grace, were awakened by screams between 1:30 and 2:00 A. M. From her window, Mrs. Bishop saw a woman reeling and tottering and then fall to the sidewalk. She ran out into the yard and saw a man come up, stoop and peer at the girl on the ground. When she appeared, he went north to an automobile which was parked on the west side of Grace Avenue headed south. He backed the car to turn around in Grace Avenue and head north. In doing so, he backed against a light standard causing the globe to fall off and break. Mrs. Bishop immediately called the police. Mr. Krings also saw the automobile back against the light standard, which was directly across the street from his house, and drive away without lights.

The police arrived about 2:00 A. M. Radio calls were received by two police cars at 1:58 A. M. They found Miss Davidson dead from a deep stab wound in her throat. They identified her by articles in her purse, which was near her body. Later her body was identified at the morgue by a woman with whom she had lived and also by her mother. The lamp post, which had been struck by the car, was observed and it was found that there was a long scrape mark on it and an indentation below the scrape mark. Defendant was arrested on July 10th and the car he was driving was placed against this lamp post. It was found that marks on the rear bumper of the car matched the scrape mark on the post; and that the exhaust pipe, which was bent, fitted the indentation on the post. A butcher knife with a four inch blade was found under the seat cover of the driver's seat. When this knife was shown to defendant at police headquarters he fainted.

On the evening of the day he was arrested, defendant signed a written confession in question and answer form. An assistant circuit attorney asked the questions and these, together with defendant's answers, were written on the typewriter by a police officer in the presence of outside witnesses and newspaper reporters. The following account of the crime of May 1, 1945 appears from this confession. Defendant worked until midnight at the St. Louis Malleable Casting Company. He left in his car, a blue 1936 Pontiac coach which he had owned since December 1944, and while on Grand Avenue he saw Miss Davidson alone on the street car. He followed the car to Meramec, where she got off and walked west on Grand. When he saw her turn up Osceola, he got out of his car and met her. He told

her "this was a stickup, take it easy, and she started hollering," and struck him with her pocketbook. Then he stabbed her "around the right side of her neck." He said that after she fell and "while laying down she turned over on her face." He said he thought he heard someone open a door and started to leave. Then he did not hear anything and "started back to see how bad she was hurt." "Then somebody did come out of a house door there" and he "went on and got back into the car, started the motor, backed up," hitting the lamp post.

After the confession was signed, defendant went with the officers to show them his movements on the night of the crime. He showed them how he drove on Grand to Grace Avenue, then south one block to Bingham Avenue, then on Bingham back to Grand from which point he told them he saw Miss Davidson turn off Grand on Osceola. He said he then made a "U" turn on Grand, came back Bingham to Grace where he parked his car about halfway between Bingham and Osceola. He then took them to the northeast corner of Osceola and Grace, where he met Miss Davidson, and reenacted the crime in detail. He described the position in which he left her body after murder, exactly as the officers found it at 2:00 A. M. on May 1st.

Also that same evening after the confession was signed, newspaper reporters, for the Post Dispatch and Star Times, talked to defendant separately. Defendant, after being told that they were newspaper men, related to each of them details of the crime. He demonstrated how he held the knife and the motion he made in stabbing Miss Davidson; and said he stabbed her, instead of striking her with his other hand, to keep her from hollering. A reporter for the Globe Democrat talked to defendant for an hour at Police Headquarters on the afternoon of the next day. He discussed the details of the confession which his paper had published that morning. Defendant said they were correct, and described the whole incident to him. He said he only intended to rob her but said that when she struck him with her purse he lost his head and stabbed her. They were alone for about 15 minutes, during which time the reporter asked him if he had been mistreated or coerced or promised anything by the police and he said that he was not. Defendant said he was guilty and thought he would get the gas chamber and thought he preferred that to life imprisonment. He also said he had lost $80.00 shooting dice, "had placed a piece of jewelry of his wife's up as surety for some of his loss," and needed money to pay debts.

Defendant has briefed the following assignments of his motion for new trial: that the grand jury was improperly selected in a way that discriminated against negro citizens; that the quashed indictment was a complete nullity; that the information substituted therefor was invalid; that the state's attorney was permitted to ask improper questions concerning the death penalty on the voir dire examination

of jurors; that the court improperly admitted defendant's confession as voluntary; that the court did not instruct on the issue of its voluntariness; that the court improperly limited cross-examination of a police officer, Sergeant Cliffe, on this issue; that the court improperly permitted testimony of newspaper reporters concerning defendant's confession; that there was no evidence other than the confession upon which to predicate a conviction; and that a verdict should have been directed for defendant.

■ Defendant, who was a negro, says that the method used for selection of the grand jury does not follow the statute (Sec. 843; this and all other references are to R. S. 1939 and Mo. Stat. Ann.)'; and that the method used is open to discrimination against negro men and limits their opportunities to serve on the grand jury in violation of their constitutional rights. Of course, every method is open to discrimination where provision is made for exercise of any discretion in choice, as Sec. 843 does, but that alone does not deny equal protection of the laws. [Williams v. Mississippi, 170 U. S. 213, 18 S. Ct. 583, 42 L. Ed. 1012; see also Smith v. Texas, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84.] The decisive matter is whether or not there actually was discrimination, and the burden to establish that was on defendant. [Akins v. Texas, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692 and cases cited.] It is only when the defendant is deprived by design of the chance of having negroes on the jury that the Fourteenth Amendment to the Federal Constitution may be invoked. [State v. Logan, 341 Mo. 1164, 111 S. W. (2d) 110.] Grand jurors have very important duties, which require men of ability and good judgment, so that it certainly seems proper to give some discretion as to their choice to responsible officials. In most counties, this is left to the sheriff or the County Court (see Sec. 704); but surely no one should be better able to perform this function intelligently and impartially than the circuit judges.

The record in this case fails to show any deliberate and intentional limitation or discrimination because of race or color. Defendant does not point out wherein it does, but argues mainly against ■ the method used saying that "the judges could easily limit the number of negro men called." It was shown the grand jury was taken from a list of 600 names selected by the 18 circuit judges; each judge customarily furnishing about 33 names. There is nothing to indicate that these names were not approved by all of the judges in general term in accordance with Sec. 843. The judges each proposed persons known to them whom they believed to be capable of performing the duties of grand jurors; and this was a practical way of complying with the requirements of Sec. 843. It affirmatively appears that they made an effort to find qualified negroes and to see that they were included in the list. The names of eleven in the grand jury wheel (selected at random) were identified as negroes and no attempt was made to show

that they were the only ones. Some of the negroes on the list were business men, some newspaper men, and some were officers of colored organizations. One of these, who was a witness for defendant, said he had served on a grand jury within the last two years and had been called as an alternate at another time. Another was in the list drawn at the June Term 1945, during which defendant was indicted. There was no showing made by defendant as to how many negroes were on the list at other times or how often they had served in the past. It was shown that before each term all of the names on the list, except those who had served at the last term, were put in the grand jury wheel and 75 names drawn in the presence of two of the judges. The grand jury was then selected from these names by the Presiding Judge. There is nothing to show bad faith or design to exclude negroes, or to select them on any proportional or limited basis. On the contrary, defendant's own evidence shows that the judges sought qualified negroes for the list and that they had been called to serve.

Furthermore, under our constitution a charge may be made by either indictment or information (Art. I, Sec. 17, Const. 1945; Art. II, Sec. 12, Const. 1875); and an information may be substituted for a defective indictment under Sec. 3953. Defendant contends that this could not be done in this case because the indictment was a nullity. The indictment was quashed because it did not specifically allege the date on which Miss Davidson died. It did state that she was stabbed on May 1, 1945 and that this was a mortal wound of which she then and there did die. The indictment was not claimed to be defective in any other respect and it requires a very technical construction to hold it defective at all. Defendant cites State v. Horn, 336 Mo. 524, 79 S. W. (2d) 1044; but the indictment there was held a nullity because it was not presented to the court while it was in session as required by Sec. 3928. (Then Sec. 3539, R. S. 1929.) The situation here is not comparable. We hold that the indictment herein was not a nullity and that the information was properly substituted under Sec. 3953. After the substitution, the time for trial was fixed by agreement and was not begun until about two months later. We, therefore, overrule the assignments concerning the indictment and the substitution of the information.

The state's attorney asked jurors the following question: "Gentlemen, if the State's evidence shows the defendant to be guilty beyond a reasonable doubt and if you gentlemen are satisfied of the defendant's guilt beyond a reasonable doubt and if you further find and believe that the extreme penalty of death is proper in the case from the evidence do you have any scruples, any impressions, or opinions, or beliefs that would preclude you from voting for the death penalty?"

Defendant objected on the ground that the state's attorney "attempted in his question to tie the jury to the death penalty." He

cites State v. Pinkston, 336 Mo. 614, 79 S. W. (2d) 1046. In that case, the questions were very different. ("If you believe and found from the evidence beyond a reasonable doubt that the defendant was guilty, if you believe from the evidence that the death penalty was the proper penalty to follow a finding of guilty, would you vote for it"?) We held this improper saying: "An attorney should not, in advance, ask a juror to speculate upon what he would do and how his verdict might be influenced by certain contingencies that may later arise in the trial." We further held "that the ends of justice in this case would be better fulfilled if the examination of prospective jurors had been limited to ascertaining whether the juror had such an opinion as would preclude him from returning a verdict with the death penalty." We think it is obvious the criticised question in this case was so limited and that these questions were proper to find out whether or not the jurors were disqualified under Sec. 4058. [See State v. Boyer, 232 Mo. 267, 134 S. W. 542.] Therefore, this assignment is overruled.

 The rest of defendant's assignments pertain to the voluntary character of his written confession and of his oral confessions thereafter to others, and to proceedings concerning them. The trial court held a preliminary hearing outside of the presence of the jury before admitting it and ruled that it was voluntary. Defendant's position at the trial and here is that these confessions were inadmissible as a matter of law because the evidence conclusively shows that they were involuntary. We have held confessions inadmissible as a matter of law for this reason in several cases. [State v. Butts, 349 Mo. 213, 159 S. W. (2d) 790; State v. Williamson, 339 Mo. 1038, 99 S. W. (2d) 76; State v. Ellis, 294 Mo. 269, 242 S. W. 952; State v. Powell, 258 Mo. 239, 167 S. W. 559, 266 Mo. 100, 180 S. W. 851.] We should do so on the basis of the evidence at the preliminary hearing on the question before the Court, (or upon a consideration of all the evidence there and before the jury) if the evidence does conclusively show that the confession was involuntary. [State v. Williamson, supra; State v. Gibilterra, 342 Mo. 577, 116 S. W. (2d) 88.] Likewise, we should also consider the evidence before the jury if it aids the state's case on this issue.

The state's evidence showed that defendant was arrested on the morning of July 10th about 4:00 A. M. and placed in a cell at the First District Police Headquarters about 4:30 A. M. He remained in his cell until 8:55 A. M. when after having had breakfast, he was brought before Captain Grabbe in charge and questioned by him and other officers for about an hour. Captain Grabbe said defendant was asleep in his cell at 7:30 A. M. Defendant was shown the marks on the bumper of his car and told that they fit the marks on the lamp post. He was put back in his cell about 10:00 A. M. and remained there for half an hour. He was brought out several times so that persons,

who were victims of somewhat similar robberies, could see him for identification. He remained in his cell from 11:00 A. M. until about 1:30 P. M. when he was again brought out for questioning, which continued for more than two hours. Seven or eight officers participated in the questioning, which was persistent. They said, however, that the questioning was not continuous; that at intervals defendant was permitted to smoke; that he was given plenty of water to drink; and that he was also given some fruit. About 3:30 P. M. the other officers left him with Sergeant Walter Cliffe to whom he later admitted his guilt.

All of the officers said that no force was used against defendant; that no threats were made toward him; and that no promises were made to him. "Major Seibels (Chief of Detectives) wanted to know why he didn't tell the truth about it, mentioning that he had the knife in his automobile, and he told Major Seibels that if he was guilty of the crime that he was accused of where he come from (Mississippi) they would string him up to a tree and set fire to him. . . . Major Seibels told him that would not happen to him in the City of St. Louis; that he would receive a fair and impartial trial."

At the preliminary hearing before the court, Sergeant Cliffe related his conversation with defendant as follows: "I says, 'You have got something on your mind and I would like you to tell me what it is.' I says, 'Are you worried about your mother and father?' He says, 'My mother and father is dead.' He says, 'I am worried about my wife and baby to be.' (Their child was born about a month later.) . . . I related to him that the change of the moon causes people to get ideas and affects you in some way. (He also said he told defendant about 'the eclipse of the moon which we had the night that the crime was committed' and that 'the old saying is the change of the moon causes people to do things they wouldn't do ordinarily.') . . . I says, 'Would you like to see your wife?' He says, 'What are you doing, kidding me?' I says, 'No, I'm not kidding you,' I says, 'have you a telephone in your home?' He says, 'There is a telephone where we stay at 1815-A Papin street. I shoved the telephone over to him and told him to use it and call his wife.' 'Well,' he says, 'you have been fair enough with me,' he says, 'you call her,' which I did. I called his wife and told her her husband was being held at the First District at Holly Hills and Colorado in Carondelet and he would like her to come down and see him, and I asked her if she had any means of transportation. She told me she didn't. I told her I would send a crew over there and bring her down, which was done, and after I hung up the 'phone Van Ramsey said to me, 'I would like to know your name,' and I told him. He says, 'You are the first man,' he says, 'that has ever sat down and talked to me like you have since the death of my father,' and I says, 'Tell me why you killed that girl over at Osceola and Grace,' and he says, 'I didn't aim to kill

that girl,' he says, 'I was trying to get some money.'" Sergeant Cliffe said that defendant talked to his wife for 15 or 20 minutes.

After this conversation with Sergeant Cliffe, and after he had talked to his wife and told her about his guilt, defendant related the details of the murder to several other officers and was given a warm evening meal. Thereafter, when he indicated his willingness to make a written statement, Assistant Circuit Attorney Thomas E. Dowling came to the District Headquarters about 7:00 p. m. Defendant was informed who he was and Mr. Dowling advised him of his rights, telling him "he could make a statement if he cared to and if he didn't want to he didn't have to;" that "whatever he may say may be used against him" by the prosecuting authorities; and that no promises were made to him. When he said he would do so, he was told that the questions and answers would be transcribed; that if he felt like he wanted to add his signature he could; and that "if he saw fit to make any corrections or alterations in the statement he had the right to do that." The statement covered six pages and defendant signed each page. He had gone through the fifth grade in school and could read and write. According to the witnesses, he did read each page before signing it. The record indicates that he was a man of at least average intelligence. He had come to St. Louis almost ten years before his arrest.

Defendant did not testify before the jury but, at the preliminary hearing on whether his confession was admissible, he said that he was up all of the night before he was arrested; that he did not sleep in his cell prior to being questioned; and that he was questioned most of the day, but his testimony shows that this was not continuous. While he said he was never in his cell more than 10 minutes at a time during the day, he later told of being in his cell for more than half an hour on one occasion. He also said one of the officers said to him "if the Captain would give him permission he would get it out of me;" that "he was going to kick it out of me;" that he was told he had been identified by victims of other crimes and asked to tell where he was on the dates they were committed; that he was taken to the police garage to look at the marks on the bumper of his car; and that when he would not get down to look at it an officer kicked his feet out from under him. He did admit that he was given an evening meal of meat and potatoes and that he talked to his wife before making the written confession.

Defendant said that he was tired and sleepy when Sergeant Cliffe talked to him; that he talked to him about religion; and that he told him the moon story and said "it works on a man at a certain time and no man isn't responsible for what he do." He also testified that Sergeant Cliffe said he had kept the others off of him and to tell him about it and he would see that none of them bothered him; but that when he found out about his wife he said he would lock her up also

if he didn't tell the truth; and that after they brought his wife in he said that he did it. He stated that Captain Grabbe thereafter said "you might as well get it off your chest and make it light on yourself." He claimed that he was not given permission to read the written confession before he signed it but he said that he knew the newspaper men were there.

Defendant's wife said he looked tired, worn out and dirty, and that he had been clean when he left home. She said Sergeant Cliffe told her they would only hold him 48 hours for investigation. She was well treated by the officers and said that one of them talked to her at the police station and tried to make her happy. Before the jury, she testified only that she was sure defendant did come home after work at the usual time (about 1:00 A. M.) on the morning of May 1st. She said that she cooked a meal for him every night and had missed no nights.

Certainly there was no such prolonged and continuous questioning here as in Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192 and Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716, relied on by defendant. Much of defendant's argument is that Sergeant Cliffe gained his confidence "by putting himself in the role of Ramsey's father;" that the moon story caused him to confess because it held out the hope to him "that if he was influenced by the moon he was not responsible for his act," and that "if he could convince Sergeant Cliffe that the moon had caused his act he would get out of it." However, the confession to Sergeant Cliffe was not admitted in evidence and neither were the confessions which defendant said he made to other officers (Captain Grabbe and Officers Heffern and LePage) immediately thereafter. Therefore, it is unnecessary to decide whether or not these confessions were admissible. Certainly, accepting the state's evidence most favorably, there was a substantial basis for finding them voluntary.

The first confession admitted was the written confession, which appears to have been made at least two hours later, after defendant had talked to his wife and after he had been given his evening meal. It was given after Mr. Dowling had taken charge, had informed him of his rights and told him that what he said would be used against him. He knew that he was making it in the presence of newspaper reporters. (A newspaper photographer took pictures of him which were in evidence.) It is true that when a prior confession has been improperly obtained "the presumption would arise that a second confession was the product of the same influence;" and that the burden was on the state to show that defendant "was no longer dominated by such influences." [State v. Ellis, 294 Mo. 269, 242 S. W. 952, l. c. 955.] However, we think that the state's evidence hereinabove set out, was sufficient to meet such a burden and to show the voluntary character of the written confession, even if we assume that the prior

oral confessions should be held inadmissible. In Lyons v. Oklahoma, 322 U. S. 596, 64 S. Ct. 1208, 88 L. Ed. 1481, the use of a confession was upheld although it was taken on the same day as an admittedly inadmissible coerced statement brought about by very brutal treatment. Certainly the state's showing herein makes a much stronger case for defendant's written confession.

Furthermore, the written confession in this case was immediately corroborated by defendant talking freely to the newspaper reporters (persons who had no authority over him.) about the details of the crime, even demonstrating how he held the knife and how he used it for the fatal blow; and it was further corroborated and its voluntariness affirmed by defendant's conversation alone with another reporter the next afternoon. [See State v. Ellis and State v. Sanford, 354 Mo. 998 and 1012, 193 S. W. (2d) 31, 35 and 37; Certiorari denied 66 S. Ct. 1373, 1374, 90 L. Ed. 1266.] Certainly also defendant's account of his movements, from the time he began to follow the street car on which Miss Davidson was riding until he escaped after the murder, with all of the details he related and demonstrated to the police on the scene following the written confession, tend strongly to show the voluntariness and correctness of his written statement. We, therefore, ▉ hold that the written confession cannot be held involuntary as a matter of law but was properly ruled to be voluntary and admissible by the trial judge. We further hold that the evidence as to defendant's subsequent oral confessions was likewise admissible, and defendant's assignments on the admissibility of all confessions admitted in evidence are overruled. Since, in addition to the confessions, there was proof of the corpus delicti, and circumstantial evidence to connect defendant with the crime, this also disposes of his contention that a verdict should have been directed for him.

▉ We also overrule defendant's assignments concerning the limitation of the cross-examination of Sergeant Cliffe during the preliminary hearing on the admissibility of defendant's confession. Objections were sustained to questions concerning what Sergeant Cliffe knew about a statement in a newspaper article that "Ramsey confessed to both these crimes after a thirteen hour grilling by police following his arrest;" asking "if he had not made the statement when he did, what would you have done?"; and asking "what is your custom and practice with reference to questioning suspects during the first 20 hours that you have them?" The material issue on this preliminary hearing was what was actually done in this case. Sergeant Cliffe was so thoroughly cross-examined as to what he did do (as were other officers) and related in such detail everything that occurred while he was present, that we do not see how there could be any prejudicial error in these rulings. The trial court has some discretion as to the scope of cross-examination. We do not find any abuse of this discretion and hold that the court's rulings were reasonable

and proper in limiting the cross-examination to what actually occurred in this case.

As to defendant's assignments that the court failed to submit to the jury the issue of whether or not defendant's confession was voluntary or to give them any instruction on that issue, his counsel stated that he was not requesting the court to give any instructions. Moreover, when specifically asked by the court whether or not he requested the court "to give an instruction to the jury on whether or not the confession in question was or was not voluntarily made," he said he was not and that "defendant takes the position that it is a question of law to be decided by the court and not a question of fact to be decided by the jury, under the facts in this case." We have held that "an instruction on the voluntariness of a confession need not be given as a part of the law of the case under Section 3681, Revised Statutes 1929 (now Sec. 4070) without a request therefor." [State v. Gibilterra, 342 Mo. 577, 116 S. W. (2d) 88; see also State v. Hancock, 340 Mo. 918, 925, 104 S. W. (2d) 241, 245; State v. Baker (Mo. Sup.), 278 S. W. 987, 989; State v. Thomas, 250 Mo. 189, 215, 157 S. W. 330, 338; State v. Clark, 147 Mo. 20, 37, 47 S. W. 886, 890; State v. Brooks, 92 Mo. 542, 587, 5 S. W. 257, 330.] Furthermore, defendant did not offer any evidence before the jury on this issue. After the court ruled the confession voluntary, he said, as to submitting it to the jury: "I know what the jury will do and you know what it will do." Certainly in view of this failure to offer evidence and the position taken by defendant's counsel at the trial on the matter of instructions, these assignments must be overruled.

The court did very thoroughly instruct on what would constitute both first degree and second degree murder under the evidence, on reasonable doubt and on defendant's defense of alibi. There were other assignments in defendant's motion for new trial which were not briefed and should be considered abandoned. [See State v. Mason, 339 Mo. 874, 98 S. W. (2d) 574; State v. Davit, 343 Mo. 1151, 125 S. W. (2d) 47.] However, we find no merit in them. The record indicates that defendant was ably represented and had a fair and impartial trial.

Judgment and sentence affirmed. Date of execution ordered on and for December 13, 1946. All concur.