**STATE of Missouri, Respondent,**

v.

**Michael TAGGERT and Bradford Robert Hull, Appellants.**

**No. 53483.**

Supreme Court of Missouri,
Division No. 2.

July 14, 1969.

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, Norman A. Selner, Special Asst. Atty. Gen., Clayton, for respondent.

Shaw, Hanks & Bornschein, by Charles M. Shaw, Clayton, for appellant.

PRITCHARD, Commissioner.

Appellants were each convicted of the offense of forcible rape, and the punishment of each was assessed by the jury to fifty years imprisonment in the penitentiary.

It is not contended that the state failed to make a submissible case against appellants. Certain claimed erroneous rulings during the trial are presented, and the facts in connection therewith will be set forth below.

The first point is that the court erred in refusing a requested mistrial on the grounds: "(a) There were no Negroes on the venire of fifty-eight to sixty persons. (b) There was no evidence by the state that there were any Negro*e* names in the jury wheel."

No argument is made in the brief as to this or any other point. Cited under Point I is Section 498.120, RSMo 1959, V.A.M.S.; Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22; and Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25. Appellants' motion for mistrial, and discharge of the jury, came just after the twelve who were to try the case were selected. It was further then stated by counsel "that the case by its nature is— has racial overtones and implications, and therefore the defendants should have had the opportunity to have a jury selected from a panel which contained some non-Caucasions."

In the case of State v. Logan, 341 Mo. 1164, 111 S.W.2d 110, in support of the motion to quash the panel upon the ground that the deputy sheriff unlawfully discriminated against defendant in selecting all white citizens and did not summon or select any Negroes, appellant's counsel offered, and the court received, evidence to support the motion. That evidence showed, as was held by this court, that it had not been the custom to summon Negroes; that the deputy sheriff did not think he would have selected Negroes if he had known them to be good jurors; that in six years and eight

months he had never selected a Negro for jury service. The court reporter there testified that he had never seen or known of a Negro being called for jury service in the county; many Negroes lived there who were of good moral character and who stood well in their several communities, and many were male citizens, over 21 years of age, sober and intelligent. In this case, no attempt was made by appellants to show that there was any long-continued, systematic, and arbitrary exclusion of qualified Negro citizens from jury service, as was the case in Norris v. Alabama, 294 U. S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, which was held in effect to constitute prima facie evidence of intentional exclusion. In State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949, 952 [1–3], it was ruled: "The decisive matter is whether or not there actually was discrimination, and the burden to establish that was on defendant. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 and cases cited."

■ Appellants' cited cases above are of no aid to them absent any evidence of the existence of purposeful discrimination against Negroes serving on juries in Greene County. Appellants' first point is overruled.

■ Appellants moved for a mistrial and asked that the jury be discharged "for the reason that on sixteen separate occasions, the prosecuting attorney, in his opening statement, referred to certain parties as 'Negroes,' and not just as parties." The court's denial of the request is assigned as error, and appellants cite State v. Sheard, Mo., 276 S.W.2d 191. The record there was replete that appellant and his two companions were colored, and he was in the courtroom. So also here. The refusal to grant a mistrial was sustained by this court in the Sheard case, as being a matter in which the trial court has considerable discretion. The record here of the prosecuting attorney's opening statement does not itself show that the reference to appellants as being Negroes was designed to inflame the minds of the jury and thus prejudice

appellants. The references are merely descriptive of the persons involved in the crime, and what the state would prove. Furthermore, appellants at no time objected to the term during the prosecutor's opening statement, but awaited the close thereof to move for a mistrial. As the state suggests, if counsel for appellants thought the use of the term really tainted the jury he should have objected when it was first used, rather than counting the number of times it was used, and then registering his objection at the close of the statement. Point II is overruled.

■ Assigned as error is the court's action in overruling appellants' objection to the prosecutrix' testimony that she saw the "number two man" at police headquarters. The transcript shows that this testimony did not refer to either appellant. The witness was asked if she saw the number one man, who grabbed her inside her garage, in the courtroom the day of trial, and if she saw also the number three man, the last to join the other two, in the courtroom. Her answer was affirmative, and she pointed out these two persons. She was then asked if she had seen the number two man since July 14, 1966, the date of the occurrence. Her answer was "Yes," and when asked where she saw him she answered, "I saw him at the St. Louis County Police Station." Obviously the cited line-up cases, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199, do not in any way apply. Point III is overruled.

■ The trial court overruled appellants' objection to the testimony of Officer Donald Eschelbach of certain matters pertaining to the possession of certain clothing, as being "repetitious, irrelevant, and already in evidence." The court's action is assigned as error. The prosecuting witness identified certain articles of her clothing, which were then admitted into evidence without objection. Officer Eschelbach then testified that he found at the

prosecutrix' residence certain of these articles. There was no repetition, and the objected to testimony was certainly relevant to the circumstances of the initial assault upon prosecutrix. Point IV is overruled.

Officer James Scavatta was allowed to testify that appellant Taggert told him he was well acquainted with appellant Hull (and one Nathaniel Warters). Appellants' objection, here presented in Point V, is that this testimony was hearsay and irrelevant. That Taggert knew Hull would be an admission against his interest, both being charged with this crime. State v. Dixon, Mo., 420 S.W.2d 267, involved improper hearsay testimony of what a night man had told a store owner about two missing bottles of liquor being on the shelves. In State v. Chernick, Mo., 280 S.W.2d 56, the defendant was charged alone, and the prejudicially erroneous hearsay testimony was what defendant's alleged accomplice had told the circuit attorney which caused him to put out a warrant for defendant's arrest. Here, the prosecutrix definitely identified appellants as her assailants, thus establishing their conspiracy as accomplices in the crime. In State v. Loeb, Mo., 190 S.W. 299, Loeb and Doss were prosecuted jointly. The submissibility of the state's case turned on what Loeb had told one Bert Beckett that Doss was going to ship the stolen goods to Frank Beckett, and Doss was to receive one-half the proceeds from the sale. It was ruled by the court that Loeb's statement concerning his connection with the crime was admissible, but as to Doss' participation in the same it was not. Thus here, standing alone, Taggert's statement of acquaintance with Hull was admissible against the former, but not Hull. However, as the state points out, the question of admissibility of the statement became of little importance because both appellants in taking the stand as witnesses freely testified that they had a long-time acquaintance with each other. Point V is overruled.

Appellants contend that their confessions to the crime were involuntarily taken within Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The trial record shows that the court held an interlocutory hearing upon the voluntariness of the confessions outside the hearing of the jury. The court, however, did not specifically find "with unmistakable clarity" that the confessions were voluntary within the requirements of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; and Sims v. Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593. After submission of appellants' cases on this appeal this court, on March 12, 1969, ordered that the trial court, after giving counsel notice, and with appellants present, hold a hearing and receive such additional competent and material evidence as should be offered by the state and by defendants, and from a consideration of the evidence in the record and such further evidence as may be received, the trial court should make an express finding as to whether the confessions were or were not voluntary.

On April 10, 1969, in compliance with said order, the trial court held a further hearing with both appellants present with counsel. As further ordered, a supplement to the transcript containing the record of the further hearing is now filed with this court. The express finding of the court was that the statements made by appellant Taggert "to police officer James Scavatta at 10:15 p. m. on February 3, 1967, at the St. Louis County Police Department in the presence of officer Ronald Otte concerning the rape of Judith Brischetto as testified by officers *Scatta* and Otte at the time of trial were voluntary." It was also found that the statements made by appellant Hull to Police Officer Clyde Wallace in the presence of Officer Ronald Otte at 1:00 a. m., on February 4, 1967, also concerning the rape of Judith Brischetto as testified to by Officer Wallace at the time of trial, were voluntary.

The details, concerning the confessions, contained in the original transcript and

the supplement thereto are these: Clyde Wallace, Jr., with Scavatta and Otte, arrested Taggert at approximately 12:15 a. m. on February 3, 1967. Wallace immediately informed him that he had a right to remain silent; he did not have to make a statement at the time; that anything he said would be used against him in a court of law; that he had a right to an attorney for consultation, and to have him present during interviewing; and that if he could not afford a lawyer one would be provided for him. Scavatta testified that Taggert responded: "He stated he clearly understood his rights and did not wish an attorney at that time."

Wallace arrested Hull at his home about 8:15 a. m. on February 3, 1967. Hull was likewise informed of his rights in the same manner as was Taggert. Hull said that he clearly understood his rights and specifically that he did not want an attorney at that time, and that he would answer questions.

Taggert was taken to the Webster Groves Police Department and was booked on a charge of rape and was then again advised of his constitutional rights. He was then shown a copy of the department constitutional rights waiver "outlining in detail constitutional rights as dictated by Miranda." Taggert was asked to read the waiver and if he understood it to sign it. Taggert answered again that he understood his constitutional rights, and did sign the piece of paper (which had no facts on it relative to the rape of Judith Brischetto). He was then questioned for possibly thirty minutes, but then made no statement. He was placed in the department holdover for 12 or 13 hours, but not continuously. Taggert was removed from his cell at the Webster Groves station after possibly 6 to 8 hours and again interrogated; and afterward was interrogated a third time. He was given a hamburger and a cup of coffee at the Webster Groves station; his father came there but said he did not wish to talk to his son. No lawyer visited Taggert at the Webster Groves station, and at that place at no time did he make any statement concerning the rape. At about 7:00 p. m. of that day, Taggert was taken to the St. Louis County Jail along with Hull. In about three hours, at 10:15 p. m., Taggert was questioned in Major Vassal's office, and Scavatta then again advised him of his rights in detail before a statement was made, and asked him, "Do you clearly understand your rights?" Taggert answered that he did. Thereafter, during a twenty-minute interview, Taggert told Scavatta that he had raped the girl.

As to Hull, Wallace talked to him at the Webster Groves Police Department, specifically about whether he was involved in the rape. Hull then told him, after advice as to his rights, that he clearly understood his rights and what Wallace was talking to him about. At that time Hull told Wallace he did not have anything to do with the rape. This interrogation lasted about an hour, and there was a second interrogation in about five or six hours with Officers Otte and Scavatta also present. Hull told Wallace he would tell him about his involvement on the way to Clayton. Wallace took Hull to the County Police Department, but Hull did not then want to tell him about the rapes. On arrival at Clayton, Hull was turned over to Lieutenant Patty, and about six hours later Wallace talked to him again, first explaining his rights again to him, and making sure he understood them, including his right to a lawyer. In Webster Groves, Hull was given a "rights sheet" and was asked to sign it, which he did and which he read, saying he understood it. During this last interrogation Hull admitted being involved in the rape of Judith Brischetto.

█ No threats, promises or inducements were made to either appellant at any time as is shown by the officers' testimony. Taggert, 23 years of age at the time of interrogation, had finished high school. Hull, 18 years of age at the time of trial, had gone through the eighth grade, and could read and write.

By Point VI(a) appellants say that State's Exhibits 30 and 31, being the written advice given them, prove that they were not advised that anything said can and will be used against them. The detailed evidence above of the officers shows that appellants were on at least three occasions orally advised that anything they said could be used against them. Such oral testimony is sufficient to establish that this warning was given. Point VI(a) is thus without merit.

Appellants' Point VI(b) is: "There was no evidence offered by the state that appellant(s) did not request the presence of an attorney." What is in evidence is that on three occasions appellants were advised of their right to have counsel present during questioning. Apparently what is meant by this point is that there was no evidence that appellants rejected or requested counsel. Upon arrest both Hull and Taggert specifically stated that they did not desire counsel after full warnings under Miranda. In the Miranda case, loc. cit. 86 S.Ct. 1626 [36, 37], the court said, "Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today * * * Only through such a warning is there ascertainable assurance that the accused was aware of this right." In the Miranda case Carnley v. Cochran, 369 U.S. 506, 513, 82 S.Ct. 884, 889, 8 L.Ed.2d 70, is quoted, " '[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request.' " (86 S.Ct. 1626 [33–35].) And 369 U.S. 506, 516, 82 S.Ct. 884, 890, "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." These quotations mean, first, that an accused does not have to request counsel prior to interrogation in order to be offered or furnished same; he must be clearly informed that he has a right to have counsel present, and that if he does not have funds to employ counsel and desires the same, counsel will be furnished. There was here clear advice to appellants of this right to counsel. Secondly, the record is not silent as to what happened after the warnings were given. Each appellant stated unequivocally that he understood his constitutional rights (under the Miranda decision). Knowing the right to have counsel present, neither appellant made any request for same as would compel a halt in any interrogation by the police officers under the Miranda decision. See and compare State v. Reynolds, Mo., 422 S.W.2d 278, 284 [10], et seq., where although tried before the non-retroactive Miranda decision, it was held that there was no infringement of Miranda rules where defendant was, before questioning, advised that he had a right to counsel, and defendant did not ask to see an attorney. This is sufficient evidence to show a knowing and intelligent waiver of that constitutional right. (Appellants' Point VI(d).) It was not incumbent upon the state to prove that appellants did not, at any time, indicate in any manner that they did not wish to be interrogated. (Appellants' Point VI(c).) Point VI in its entirety is overruled.

■ After the further hearings were had, and the findings were made by the trial court concerning the voluntariness of appellants' confessions, they were granted additional time to file a supplemental brief and argument. By Point I of this brief, appellants say that "The trial court erred in finding that the confessions were voluntary for the reason that the purported confessions were made after appellants had been held for twenty hours without a warrant." In support of this § 544.170, RSMo 1959, V.A. M.S., and Supreme Court Rule 21.14, V.A. M.R., are cited. It has long been held that the fact that a peace officer violates the statute (and rule) by failing to release a prisoner within the time prescribed thereby

does not render a confession involuntary as a matter of law. State v. Lee, 361 Mo. 163, 233 S.W.2d 666, 668; State v. Pughe, Mo., 403 S.W.2d 635, 639–640; State v. Smith, Mo., 310 S.W.2d 845, 851 [8, 9], Cert. Den. 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231. The case of State ex rel. Cunningham v. Leavitt, Mo.App., 271 S.W.2d 63, is not in point because there the sheriff refused to bring a prisoner, held without warrant, before the magistrate in order that he be allowed to make bond, the proceedings being for contempt against the sheriff. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479, involved a violation of Rule 5(a) of the Federal Rules of Criminal Procedure requiring an accused to be taken before the nearest available commissioner without unnecessary delay. The accused there, a young lad of limited intelligence, was not given any advice as to right of counsel, or right to remain silent, and that any statement he made might be used against him.

Points II, III and IV of the supplemental brief reiterate the contentions of the original brief (Point VI above ruled) as to advice to appellants of their constitutional rights to remain silent; evidence of waiver against self-incrimination; and the totality of the circumstances as to whether there was an intelligent waiver. The Miranda case is again cited, and on the latter point additionally Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895. In that case Davis was taken into custody and was interrogated repeatedly for sixteen days, and there was no indication in the record that police advised him of any of his rights until after he had confessed orally on the sixteenth day. The court's findings, above, are supported by the evidence, and the record affirmatively shows compliance with the requirements of Jackson v. Denno, supra, State v. Devoe, Mo., 430 S.W.2d 164, 166; State v. Auger, Mo., 434 S.W.2d 1.

■ State v. Thompson, Mo., 280 S.W.2d 838, is cited by appellants in support of their Point VII that the court erroneously refused to allow proper cross-examination of Officer Scavatta concerning the purpose of writing down confessions. The state's position is that the court did not limit cross-examination, and the following excerpt from the record bears out that position: "Q. In other words, as far as the matters that you were saying, you wanted that written down, isn't that right, so you could prove it in court? MR. McSWEENEY: Let me make an objection to that as calling for a conclusion on the part of the witness and invading the province of the jury, if the Court please. THE COURT: Well, it is argumentative. It is sustained. You can ask him what he did, what was said to him." The Thompson case held that excluding testimony given in preliminary hearing, claimed to be contradictory to the Circuit Court testimony, being on the issue of the right to impeach, was prejudicially erroneous. The ruling here was that the question was argumentative, and cross-examination was not limited. The point is without merit, as is Point VIII that the court did not allow cross-examination of Officer Wallace concerning his handling of the case "another mistake" was made. Appellants' counsel asked: "Q. Now will you take that, look at State's Exhibit 31 and State's Exhibit 30. Just look at the documents briefly. Nowhere on those documents does it appear any statement that you make will be used against you, does it? A. No it doesn't. Q. Another mistake, is it?" The objection sustained was that the last question was argumentative, as it is.

Officer Patty testified that Nathaniel Warters was present at the St. Louis County Police Station at the same time that the prosecutrix was there. Appellants say that the court's permitting this testimony was prejudicial error because it was immaterial and irrelevant to the issues in the case. Warters was not jointly charged with appellants, but there was no identification of him, or no reference that he was in a line-up with any persons. While this testimony was immaterial to the issues, no prejudice is perceivable by reason of its reception. It did not have any tendency to

arouse or inflame any hostile passions. Point IX is overruled.

■ The prosecutrix testified that she heard appellant Taggert make a statement at the police station about the attack on her, "This was about ten after 10:00, after the line-up." Appellants objected, asked the jury to be discharged, and a mistrial declared. The court ordered the phrase "after the line-up" stricken, and the jury was instructed to disregard it. The request for mistrial was denied. Shortly thereafter, the witness was asked how long Taggert was in a room before she came in. Her answer was, "Long enough to walk from the line-up into the room." Appellants' objection (without any stated ground therefor) was overruled. Appellants do not suggest why any prejudicial error was committed in allowing the last answer. The line-up cases, Wade, Gilbert and Stovall, supra, are cited, but their applicability is not shown. Evidence of a mere line-up of suspects is not error, unless something additional appears to make it manifestly unfair and violative of due process of law. Point X is overruled.

■ Point XI is that Exhibits 32, 33 and 34 had not been "qualified," hence prejudicial error was committed in allowing their admission into evidence. The record shows that these exhibits, being photographs of a Ford car, were identified by Detective Scavatta, and thus the point is without merit.

■ Appellant Taggert's photographs of himself, Exhibits A, B, C and D, were rejected by the court. Exhibit A was taken in the summer, June, 1965, when Taggert got married. It shows that he had a mustache. In the summer of 1966 (the date of the occurrence was July 14, 1966), Taggert still had his mustache, according to his mother, Mrs. Bessie Taggert, and he had always worn one. Exhibit B is that of appellant Taggert wearing a mustache, holding a baby, taken in April, 1965. Mrs. Taggert believed that Exhibit C was taken

of Taggert in the spring of 1964, or earlier. This exhibit was admitted into evidence, as was Exhibit E, taken in February, 1967, showing Taggert had a mustache, and the state offered to stipulate at the time of his arrest Taggert had a mustache. Exhibits A, B and D showed Taggert holding his children and eating wedding cake. The objection to Exhibits A, B and D was that they were calculated to arouse sympathy for Taggert in the eyes of the jury, which ground the court sustained. In view of repeated testimony that Taggert always wore a mustache, wore one on the date of the alleged assault, and the photographs which were admitted showed he wore a mustache, the rejected photographs could be only cumulative evidence. See State v. Laspy, Mo., 298 S.W.2d 357, 361 [7–9]. No suggestion is made why these exhibits should have been admitted. No abuse of discretion by the court is shown, and Point XII is overruled.

■ Appellant Hull claims that State's Exhibit 35, a photograph of him, should not have been admitted into evidence because it was not qualified. Hull himself testified that the photograph was of him. The directive of the court that the words "Suspicion of robbery" on the exhibit be deleted was followed. The objection that the photograph was evidence of another offense was thus met. No other objection was made, and the exhibit was definitely identified by Hull. Point XIII is overruled.

■ Point XIV is that there is a fatal variance in the indictment charging the victim to be a female person under the age of 16 years, and the instruction setting forth that she was over 16 years of age. The record belies the contention and the point is overruled.

■ Appellants claim the court erred in refusing their requested Instruction No. 9–A. That instruction required the state to prove appellants' identification as guilty parties beyond a reasonable doubt to jus-

tify conviction. Instruction No. 9, given by the court, told the jury that if they did not believe appellants, or either of them, were the persons, or person, who raped the prosecutrix, then it was the jury's duty to acquit them. It is apparent that the instructions each covered the matter of identification, and there is no error in refusing Instruction No. 9-A. State v. Williams, Mo., 382 S.W.2d 597, 600 [7]; State v. Mobley, Mo., 369 S.W.2d 576, 582 [8]. Point XV is overruled.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

MORGAN, J., concurs.

FINCH, J., concurs in separate concurring opinion filed.

DONNELLY, P. J., concurs and concurs in concurring opinion of FINCH, J.

FINCH, Judge (concurring).

I concur in the principal opinion except the discussion of the Miranda and Carnley v. Cochran cases in the paragraph relating to appellants' Point VI(b).

That paragraph correctly recites that appellants were given full Miranda warnings, including advice of their right to have counsel present and that counsel would be appointed for them if they could not afford counsel, after which they specifically stated that they did not desire to have counsel present.

Those statements by appellants constituted waivers of their right to have counsel present and provide sufficient basis

upon which to dispose of appellants' Point VI(b). The rest of the discussion in that paragraph is unnecessary to the opinion. The Supreme Court of the United States has not elaborated as yet upon what constitutes a waiver other than to say that mere silence is insufficient. Under those circumstances, I would not speculate unnecessarily at this time as to what those decisions mean when same is not necessary to this opinion.