249 S.W.2d 857 (1952)
STATE
v.
HADLEY.
No. 42919.
Supreme Court of Missouri, Division No. 2.
June 9, 1952.
*858 Ivan H. Light, St. Louis, for appellant.
J. E. Taylor, Atty. Gen., Lawrence L. Bradley, Asst. Atty. Gen., for respondent.
WALTER E. BENNICK, Special Judge.
Defendant, Roy C. Hadley, was brought to trial upon an indictment charging him with the offense of murder in the first degree in the killing of his wife, Flora Belle Hadley, on February 26, 1930, in the City of St. Louis. The jury found defendant guilty as charged, and assessed his punishment at life imprisonment. Following the overruling of his motion for a new trial and the pronouncement of judgment in accordance with the verdict, defendant applied for and was granted an appeal to this court.
Defendant was taken into custody immediately after the commission of the alleged offense; and upon an information being filed against him, he entered a plea of guilty and was thereupon sentenced to imprisonment in the state penitentiary, where he was confined from March, 1930, until December, 1949, when, in a proceeding in this court in habeas corpus, his plea and the judgment rendered thereon was vacated and set aside upon the ground of want of counsel, and he was ordered remanded to the St. Louis city jail to await further proceedings according to law. The present indictment for the same offense was returned on February 3, 1950, and the trial begun on the following May 1st, culminating in the verdict of guilty on May 6th.
According to the state's evidence, the married life of defendant and the deceased had been turbulent from the beginning. Defendant was given to the use of vile and vicious language towards his wife and children; on occasions he had beaten his wife in the presence of one or the other of the children; and not only had he repeatedly threatened to kill his wife and the entire family, but on at least one of such occasions he had actually flourished a revolver. Over the years of the marriage there had been numerous separations, each followed by a temporary reconciliation except for the last, which had occurred two years before the tragedy.
During the period of the last separation defendant had lived in Memphis, Tennessee. However, the deceased had remained in St. Louis; had supported herself by employment as a seamstress at the Angelica Jacket Company; and had maintained a home in the upstairs premises at 2116 Waverly Place, where she resided with the other members of the family consisting of a son, David, and a daughter, Feary, along with the latter's husband, one John Hubbard. Feary was sixteen years of age at the time of the shooting, while David and John Hubbard were each twenty years of age. Defendant was forty-five years of age and his wife forty at the time the casualty occurred.
Throughout the time that defendant had lived in Memphis he had written his wife as many as thirty or forty letters, some of which had contained the usual threat that unless his wife would agree to another *859 reconciliation, he would kill her and all the family. His attitude over the years had caused his wife and children to live in constant fear of what rash thing he might sometime do. While in the light of all the circumstances it would be a mockery to say that he entertained true affection for his wife, he was undoubtedly possessed of a dominant and overpowering desire for her companionship.
Eventually defendant decided to return to St. Louis in the hope of bringing about a reconciliation with his wife; and some three or four days before leaving Memphis he purchased the revolver with which the homicide was perpetrated. After the crime had been committed he told a police officer that he had bought the revolver for the purpose of killing his wife if she should refuse to make up with him.
There was testimony of a statement by defendant that the day before the shooting he had met his wife in the vicinity of her home and had unavailingly attempted to prevail upon her to live with him again.
On the following day defendant arrived at his wife's home around five o'clock in the afternoon, armed with the revolver which he had previously bought in Memphis. As he entered the hall from whence a front stairway led up to the quarters occupied by his wife and family, his daughter, Feary, was seated at the telephone in an alcove behind the stairway in such a position that only his feet were visible to her. Feary's husband, John Hubbard, was standing by her side, but he and defendant were wholly unacquainted, since his marriage to Feary had occurred during the period of defendant's residence in Memphis. Apparently defendant did not recognize his daughter, and inquired of her and Hubbard where Flora Hadley's apartment was to be found. Feary answered, "Upstairs", and as defendant started up the stairs, Feary recognized him and called out to him not to harm her mother.
As Feary spoke, Hubbard looked up towards defendant, and seeing that he had a revolver in his hand, started to run up the rear stairs to warn the deceased, but was only part way up when he saw that defendant had already entered the kitchen where the deceased was sitting at a table, and had grasped her by the wrist. The deceased had begun to scream the moment defendant entered the room. Hearing a noise outside the room, defendant turned in its direction, and observing Hubbard coming up the stairway, he backed up against the door through which Hubbard would make his entry. Hubbard forced the door open with his shoulder, and as he did so and was in the act of entering the room, defendant fired a bullet through his chest, causing him to fall backwards down the steps, where he landed at Feary's feet. While he lay in this position Hubbard heard a second shot, which was the one that inflicted the fatal wound on the deceased.
During this whole occurrence the son, David, was in a room to the front where he was changing clothes to go out for the evening. He heard his mother's screams, as well as the two shots, after which the screaming ceased. As soon as he heard the screams he started to run towards the kitchen, and in his search for a weapon picked up a metal candlestick which was standing on the mantelpiece. The moment he entered the kitchen he grabbed for the revolver in his father's hand and began striking his father over the head with the candlestick.
Both shots had been fired before David had reached the kitchen, and it was not until after he had subdued his father that he glanced over his shoulder and saw his mother lying on the floor. He expressly denied having ever told anyone that his mother had been killed when the revolver had been accidently discharged while he and his father were struggling for its possession. This, incidentally, was defendant's purported explanation of the homicide in which he was in direct conflict with the state's evidence, as has already appeared. Still other evidence was to the effect that when defendant was taken to the hospital for the treatment of the wounds inflicted upon his head by the blows with the candlestick, he made the statement that his purpose in going to the *860 premises had been to kill his wife, and that if it were all to be done over, he would still be of the same intention.
For his first point defendant complains of the action of the court in permitting the state to show that he had entered a formal plea of guilty when he was arraigned at the original hearing in March, 1930.
The matter of the plea of guilty was first injected into the case during defendant's direct examination, when it was brought out that after the murder charge had been lodged against him, his brother, Vern Hadley, a newspaperman from Atlanta, Georgia, had interested himself in his behalf to the point of allegedly arranging with the then circuit attorney that if he would enter a plea of guilty, appropriate steps would be taken to get him a parole within a possible period of three years. He insisted, however, that at the time of entering his plea he had known nothing, and was not advised, of the different degrees of homicide.
On cross-examination defendant reiterated his understanding of the promise of a parole, and testified that the matter was "confirmed" by the late Judge Henry A. Hamilton, who took his plea of guilty. In fact, he testified that at the conclusion of the hearing Judge Hamilton had put his arm around his shoulder and had given him verbal assurances indicating his knowledge of the arrangement that had been made. He later explained, however, that Judge Hamilton had not personally told him to plead guilty and everything would be all right, but stated that the judge himself "was not in on it".
Judge Hamilton was called by the state in rebuttal, and testified that when defendant was called upon to plead, he had entered a plea of guilty, and that defendant had not been promised an early parole by himself or by anyone else while he was present.
The thing that defendant specifically complains of is Judge Hamilton's testimony that he had pleaded guilty, the contention being that in view of his own previous statement that the judge "was not in on it", the judge's testimony was not in rebuttal of anything he had said, and that it was particularly prejudicial to show his plea of guilty after the same had been set aside and vacated by this court in the habeas corpus proceeding upon the ground of illegality assigned.
A voluntary plea of guilty is a solemn confession of the truth of the charge to which it is entered, and proof of such a plea would ordinarily be competent as an admission of the accused in any subsequent proceeding in which it might be relevant and in which the occasion for reference to it might arise. Neibling v. Terry, 352 Mo. 396, 177 S.W.2d 502, 152 A.L.R. 249; City of Columbia v. Jackson, Mo.App., 227 S.W. 644; 22 C.J.S., Criminal Law, § 733, page 1257. This presupposes, however, that the plea was not only accepted but properly so, for if it was either rejected by the court, or was entered under such circumstances as to have rendered it invalid for what it purported to be, it would not be competent to be received in evidence (and certainly not in a retrial for the same offense) except for the presence of other circumstances which might serve to justify its admission. State v. Meyers, 99 Mo. 107, 119, 12 S.W. 516.
Notwithstanding the fact that defendant's plea of guilty had been set aside in the habeas corpus proceeding, the circumstances were such that there is still no error to be attributed to Judge Hamilton's testimony that such a plea was entered. Inasmuch as defendant himself had already testified to such a plea, the judge's testimony would in any event have been harmless. But beyond this, the state is entitled to stand upon clear justification for the testimony complained of, and not upon mere excuse. In view of defendant's previous testimony regarding the efforts in his behalf, his subsequent statement that the judge "was not in on it" could only have meant that the judge was not one of the moving parties in allegedly arranging for the entry of a plea of guilty under promise of an early parole. However his testimony that the judge had knowledge of the arrangement and had "confirmed" it by his conduct at the hearing still stood as *861 what defendant claimed to have been the actual fact. In this situation Judge Hamilton's testimony constituted proper rebuttal for the state; and defendant's insistence to the contrary is unavailing. State v. Smith, 354 Mo. 1088, 1097, 193 S.W.2d 499, 503.
For his second point defendant raises the question of whether the court erred in refusing to permit proof of alleged prior contradictory statements of the state's witness, Feary Hubbard.
The precise point as made in defendant's brief is confined to the court's action in sustaining the state's objection to questions put to Feary on cross-examination concerning what she had purportedly told the police officers as evidenced by what appeared in the police report. Strangely enough, defendant suggests that we should hold that any error in this regard was cured when the state itself later read the entire report to the jury, but insists that the point is none the less for the court to decide. Suffice it to say that defendant is correct in his appraisal of the situation, since any initial error, if such there was, in preventing him from laying a proper foundation for Feary's impeachment by the police report was obviously corrected when the state itself put the entire report in evidence. State v. Shipley, Mo.Sup., 232 S.W.2d 515, 518.
Defendant argues however, that by introducing the police report, the state vouched for its contents as worthy of belief; that the report either showed the homicide to have been an accident, or else was so shrouded in uncertainty about it as not to support a conviction; and that having placed the report in evidence, the state is now precluded from attempting to sustain the judgment of conviction upon other evidence contradictory of the police report.
It is quite true that the police report did contain a purported statement of the son, David, which tended to support the claim that the deceased had been accidentally shot while David was struggling with defendant over possession of the revolver. In this respect at least the police report was contradictory, not only of David's testimony as a state's witness, but also of the theory of the case upon which the state relied for a conviction. Counsel must be aware, however, that it is now of no avail that there was a conflict of some degree in the state's case so long as there was evidence which, if believed would support a conviction upon the charge as made. Our statement of the facts has shown the presence of evidence to support every element of the offense of murder in the first degree, section 559.010 RSMo 1949, V.A.M.S.; and while any inconsistencies in the state's case were matters to be urged for whatever they were worth in argument to the jury, they are of no consequence in this court where we must accept the facts as resolved by the jury on substantial evidence.
As a further matter of complaint defendant charges error in connection with the action of the court in permitting the state to adduce secondary proof of the contents of a certain letter in the absence of proof of the nonavailability of the original. This was a letter which defendant had written to his son, David, and which the latter had turned over to the St. Louis police. Defendant concedes that the point was not preserved in his motion for a new trial, and as a consequence it is not open for our review. State v. Holliday, 353 Mo. 397, 182 S.W.2d 553; State v. Shipman, 354 Mo. 265, 189 S.W.2d 273; State v. Wilson, 361 Mo. 78, 233 S.W.2d 686.
For his next point defendant contends that he was denied a speedy trial as guaranteed by the Constitution of 1945, Art. I, Sec. 18(a), V.A.M.S., and that by reason of the alleged denial of such right he was entitled to his discharge.
He is of course claiming no undue delay between the return of the indictment on February 3, 1950, and the beginning of his trial on May 1, 1950. On the contrary, what he is concerned with is the delay of twenty years between the time he was originally taken into custody in 1930 and the beginning of the last trial on May 1, 1950. In short, it is his contention that the existence of the void judgment under *862 which he was held in confinement in the penitentiary until the judgment was set aside in the habeas corpus proceeding could afford the state no valid excuse for the delay in question; and that after the great lapse of time during which many of the witnesses died or became otherwise unavailable and the memories of the survivors became hazy and uncertain, no second trial should have taken place.
As we have in effect already indicated, there is no claim of any right to discharge under the terms of the statutes which have been enacted as a partial legislative construction or definition of the constitutional provision now in question. These statutes are sections 545.890 and 545.900 RSMo 1949, V.A.M.S. Instead, the whole argument is based upon the broad provision of the Constitution itself that in criminal prosecutions the accused shall have a speedy trial.
Even though the facts are hard and the circumstances most unusual, this court must be none the less confined in its decision to nothing but the legal aspects of the case. If it be that defendant has not been denied his constitutional right, then any question of whether the peculiar facts and circumstances should be taken into account for any other purpose must be addressed to some department of government having authority to act in such respect.
The constitutional right to a speedy trial is designed to prohibit arbitrary and oppressive delays which might be occasioned through the fault of the prosecution. But here there has been no delay by the state in the sense that the state has ever been slow or reluctant to prosecute. On the contrary, the delay is wholly due to the belated discovery of a fatal error in the record of the first proceeding, which, it is true, sufficed to entitle defendant to relief from the sentence and judgment which had been pronounced upon him, but only to the point of remanding him back into custody to await further proceedings according to law. In other words, the ultimate situation is no different than if he had appealed from the first judgment upon the same ground that he later advanced in habeas corpus, and had secured a reversal of the judgment. The offense of which he is now convicted is the identical offense with which he was charged in 1930; and at every moment of the period during which he was imprisoned under the first judgment, the courts were open to him for the redress which he obtained as soon as he invoked his remedy. There has been no denial of defendant's constitutional right to a speedy trial. Ex parte Meadows, 71 Okl.Cr. 353, 112 P.2d 419; 22 C.J.S., Criminal Law, § 472(d), page 727.
While defendant's daughter, Feary, was on the stand, she was asked on cross-examination if she could give the dates and durations of the separations of her father and mother prior to the last separation in 1928. She answered that the first time her father left Denver where the family had previously resided, he had forged some checks in that city. Defendant's counsel objected to the reference to the forgery, and asked for a mistrial. The court denied the mistrial, but of its own motion directed that so much of the answer be stricken as was not responsive to the question. Defendant now argues that the court erred in denying his request for a mistrial. In view of the court's action in ordering the gratuitous portion of the answer stricken and in later instructing the jury to disregard all testimony which had been ordered stricken, there could be no proper basis for holding that the court had abused its discretion in refusing a mistrial. State v. Walker, Mo.Sup., 46 S.W.2d 569.
For his final point defendant complains of the refusal of a mistrial after the state had inquired of his witness, Newhall, on cross-examination, if he knew that defendant had been arrested in St. Louis on a particular date in 1927. Newhall had formerly worked with defendant, and had been called to testify that defendant bore the reputation of being a peaceful and law-abiding man. The question was in fact proper for the announced purpose of testing the knowledge of the witness regarding the matter concerning which he was undertaking to testify. State v. Carson, Mo.App., 239 S.W.2d 532, 536, and cases cited. None the less the court *863 sustained an objection to the question, but, as in the previous instance, denied a mistrial. In these circumstances there is obviously no basis for defendant's claim of error.
Defendant suggests no error in the record proper, and we have found none. Inasmuch as a brief has been filed on behalf of defendant, all matters incorporated in his motion for a new trial are to be taken as abandoned except those specifically mentioned and relied on in his brief. State v. Ramsey, 355 Mo. 720, 197 S.W.2d 949; State v. Perry, Mo.Sup., 233 S.W.2d 717; State v. Fitzgerald, Mo.Sup., 174 S.W.2d 211.
It follows that the judgment and sentence should be affirmed, and it is so ordered.
All concur.