STATE of Missouri, Respondent,

v.

Kenneth PETERSON, Appellant.

No. KCD 28393.

Missouri Court of Appeals,
Kansas City District.

Dec. 27, 1976.

Thomas M. Larson, Public Defender, Lee M. Nation, Asst. Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

Appellant was convicted, after a jury trial, of assault with intent to kill with malice, Section 559.180 RSMo 1969, and sentenced to life imprisonment. He raises three points or assignments of error on this appeal. *First,* he asserts that the court erred in overruling his objection and motion for a mistrial when Detective James Theisen of the Kansas City, Missouri police department testified as to the lineup identification of the defendant by one Roberta Hodges, upon the basis that such evidence was hearsay, inadmissible and highly prejudicial. *Second,* he charges the trial court with error in failing to give his three requested instructions on the issue of defendant's identification. *Third,* he claims that he had previously been placed in jeopardy on the charge for which he was convicted and the court's action in failing to grant his motion to dismiss violated his rights under the Fifth Amendment.

A summary of the evidence and record, viewed in the light most favorable in support of the jury verdict, is necessary for the resolution of this appeal.

11th Street in Kansas City, Jackson County, Missouri is an east-west street, and Altman's Jewelry Store (hereafter Altman's) is located on the north side of 11th Street between Walnut Street to the east and Main Street to the west. On November 29, 1974, shortly before noon, a late model green Cadillac automobile was observed by two pedestrians, William Steinman and Donald Calvert, who were walking south on Walnut. The Cadillac was stopped at the northwest corner of 11th and Walnut headed in a westerly direction, and the pedestrians testified they observed three Negro males get out of the car and walk west on the north side of 11th. The witnesses, who were together, crossed 11th and Walnut and walked west on 11th on the south side. Thus, they were proceeding in the same direction as the three Negroes on the opposite side of 11th and somewhat behind the three. The three men were observed going into Altman's. When the witnesses came to a point across 11th Street from Altman's, they observed the three men in the store and one of them holding a handgun pointed at a clerk behind the counter in the store. Both of the witnesses hurried into Harzfeld's store, which has an entrance on the south side of 11th, approximately opposite Altman's entrance. One of them, Steinman, proceeded to a telephone and called the police, while the other, Calvert, stationed himself at the entrance of Harzfeld's where he could observe the Altman store. Thus, the robbery was reported to the police while it was still in progress.

Neither of these two witnesses could identify the defendant as one of the three men involved, and neither obtained the license number of the green Cadillac. The three men were in Altman's about five minutes and then were observed by the witness at the door of Harzfeld's to emerge and run

west on 11th to Main Street, cross Main and enter the Main Street entrance of Macy's. This store has an entrance on Main and also an entrance on Baltimore Avenue one block west of Main, so that a person entering Macy's on Main can go through the second floor of the store and exit on Baltimore.

An employee of Macy's, Harold Edwards, who was due to report on his job at noon, left a bus at 11th and Baltimore at about 11:50 a. m. on that day and observed a green Cadillac parked on the east side of Baltimore near the Macy's entrance on that street. There was a black woman behind the wheel and he observed a black young man get in the car and two black men come out of Macy's carrying a large paper bag and also get into the Cadillac. When this witness entered the store, he observed Macy's security officer retrieve some rings from a trash receptacle. This witness could not identify this defendant as one of the men he observed getting into the green Cadillac.

State's witness, Ronald V. Reine, was a pedestrian on Baltimore in the vicinity of 11th Street and testified that he observed a green Cadillac parked below Macy's and occupied by three black males and a black female. Reine observed a police traffic officer park his motor scooter. He then observed the officer approach the Cadillac with his service revolver drawn. Someone in the automobile started firing and blasted the officer back against the building wall and then the Cadillac "took off". Reine obtained the license number, which was Missouri XN 7303. He then ran to a business telephone and called the police. This witness could make no identification of defendant.

John M. Evans testified for the state. He was a northbound motorist on Baltimore. He observed the greed Cadillac stopped on the east side of Baltimore; he observed that it had four occupants; and, saw the police officer shot by the person in the left rear seat. Evans also obtained the license number, but could make no identification of the defendant. Frank Clark was in the same automobile as Evans, and observed and testified to the same events.

Ramen Kerfoot testified that on November 29, 1974, he was a member of the Kansas City, Missouri police department assigned to traffic control in the downtown area. At about noon on that day, he received a radio broadcast regarding the Altman holdup and a description of the green Cadillac, and information that it was in the vicinity of 10th and Baltimore. He operated his three-wheel motor scooter to that intersection and observed a green Cadillac. He parked his vehicle and approached the automobile, and one of the occupants fled. He ordered the other occupants out of the car, whereupon, two shots were fired at him from the back seat through the front window of the car, the second shot striking him in the chest. He was unable to identify the defendant as being in the Cadillac.

Detective James Dawson testified that he received the license number of the Cadillac from Ronald Reine at the scene of the shooting, and that Mo. XN 7303 was registered in the name of defendant, Kenneth Peterson. He interviewed the defendant at police headquarters later that evening. The defendant told the police officer that his Cadillac had been stolen from a service station where he had taken it that morning to have snow chains put on. When questioned about the shooting of Officer Kerfoot, the defendant became visibly upset, began perspiring, pounded the desk and said to Detective Dawson, "It's all that crazy fucking nigger's fault. He wasn't supposed to shoot nobody. I told that crazy nigger."; "That crazy nigger said he wasn't going to get busted. He would shoot anybody"; and, after being permitted to use the telephone, he said, "I know where he's at and he has some of the jewelry with him." The defendant refused to give this party's name, but did give Detective Dawson the "nicknames" of two parties that he said were involved. He sought immunity, without success, and refused to give a formal statement.

The defendant's first point hinges upon the testimony of two of the state's witness-

es, Roberta Jean Hodges and Detective James Theisen.

Ms. Hodges testified that she was employed by Altman's on November 29, 1974, and that at about noon on that day, three black men entered the store. One of these, she identified as the defendant. The defendant announced that "This is a holdup". He had a weapon in his hand. At that time, she was seated at her desk adjacent to the diamond case about three feet away from the defendant. The defendant came around the case "right in front" of the witness; broke the glass of the case with the barrel of the gun, and began to put diamonds or jewelry into an attache case; and, told the witness to put her head down. She stated that the three men were in the store "five minutes or more". Later that day, she was shown a number of photographs at the police headquarters and identified a photograph of the defendant as the man with the gun.

On direct examination, she testified, without objection, that at the store, before she was shown the photographs at police headquarters, she told a Detective Roberts that she thought the man with the gun was named Curtis Allen, who had been in the store sometime previously, with the defendant, to leave a watch for repair and whose name and address she had taken from Altman's records. She later, however, positively identified the defendant from the police photographs, at a police lineup the following day, and made a positive, unequivocal, in-court identification of the defendant. She freely admitted in her testimony her initial mistake in names.

Ms. Hodges was vigorously cross-examined as to her statement to Detective Roberts naming Curtis Allen, and repeatedly explained her mistake as to names. At the police station when she made the photographic identification of the defendant, she told the detectives of this initial mistake in names. She was shown a photograph of Curtis Allen at the police station and stated definitely that he was not involved in the robbery.

Detective James Theisen, one of the officers assigned to the Altman case, testified that he had interviewed Ms. Hodges, had shown her police photographs, and had thereafter issued a pickup for the defendant and had conducted a lineup the following morning. On *cross-examination,* Theisen stated that Ms. Hodges had stated she believed one of the men was named Curtis Allen, but she "at no time made a definite statement" to that effect. He was cross-examined at great length as to statements made by Ms. Hodges about Curtis Allen and the defendant. On *recross-examination* by defense counsel, the following occurred:

"Q. * * * It's true, is it not, Mrs. Hodges identified Mr. Curtis (sic) and said he was the man—her first impression was, he was the man that robbed the place?

A. She did not, no, sir.

Q. She didn't tell you that?

A. She did not at no time say he was the man that held her up."

On *redirect examination* by the prosecutor, the following occurred:

"Q. Detective Theisen, when Mrs. Hodges identified Defendant's Exhibit No. 12 (police photograph of defendant), did she identify that man as being Allen Curtis (sic) or identify him as being the man who robbed the store?

A. She stated that is the man who robbed the store.

MR. HAGGERTY: (Prosecutor) All right. No further questions.

MR. HANDLEY: (Defense Counsel) I have no questions."

The witness was then excused and the court declared a recess, and gave the jury the usual recess admonishment. Thereupon, defense counsel objected to the foregoing question and answer as violative of the hearsay rule under the "Degraffenreid Principle" (*State v. Degraffenreid,* Mo. banc 1972, 477 S.W.2d 57). The court overruled the objection as untimely made, coming after the question was asked and the answer given. Counsel also asked that the court declare a mistrial, which request was denied.

The defense offered the following evidence, pertinent to the issues here:

Curtis R. Allen stated he was a self-employed jewelry dealer; that he deals with Altman's and that they have his name and home address; that he is not acquainted with the defendant; and, has never been in Altman's in defendant's company. Allen was in the vicinity of 10th and Baltimore in his automobile when Officer Kerfoot was shot. He heard the shot but did not observe any of the occurrences connected with the crime.

Edward Golden testified that he operated a Standard Oil service station at 3042 Benton Boulevard. He testified that about 11:00 a. m. on November 29, 1974, the defendant brought his green Cadillac automobile to the station to have snow chains put on. Two men were with the defendant. The defendant left the car outside the building and brought the keys to the witness, who requested that defendant leave the keys in the car. Later, the witness discovered that the Cadillac was gone. While he could not pinpoint the time of this discovery, it was before he could "get to" it in order to install the snow chains. Witness Golden did not observe the car taken and did not know the identity of the person who drove it away, but admitted such person could have been the defendant.

Quinlock Shobe, the former "girl friend" of the defendant, was offered as an alibi witness. She testified that around noon on November 29, 1974, she saw the defendant in a house in the vicinity of 39th and Olive with another woman.

The defendant, Kenneth Peterson, testified in his own defense. He admitted the ownership of the 1972 green Cadillac DeVille Sedan here involved; that he took it to Golden's service station at about 10:00–10:30 a. m. on November 29, 1974, and left it there to have snow chains installed; that he was then driven to 3928 Olive by an unknown man, who was at the service station, and saw Quinlock Shobe there about noon; that later, his grandmother told him on the telephone that there was a police pickup broadcast for him; and, that he

went to police headquarters in the late afternoon in the company of his parole officer, where he was interrogated. He denied the statements attributed to him by Detective Dawson. He stated he did not know Curtis Allen, had never been in Altman's, and denied his guilt and any connection with the Altman robbery or the shooting of Officer Kerfoot.

The defendant admitted a previous conviction in the Federal Court in 1967 for robbery of the Twin City Federal Savings & Loan Association of Kansas City, for which he received a sentence of fifteen years on a guilty plea and served five years and eight months, being released on parole September 18, 1972. He was still on parole November 29, 1974. He also admitted a previous conviction in 1963 for stealing from the person.

Assuming but not deciding, on the record in this appeal, that the question and answer of Detective Theisen on redirect examination, as above quoted, was inadmissible under the hearsay rule, on the authority of *State v. Degraffenreid,* 477 S.W.2d 57 (Mo. banc 1972), the trial court properly ruled the objection thereto to be untimely. It is axiomatic under the procedural law of this state that proper and timely objections to inadmissible evidence must be made and adversely ruled in order to preserve error. *State v. Jackson,* 500 S.W.2d 306, 314[15, 16] (Mo.App.1973). Under ordinary circumstances, an objection not made until after an answer is given is not timely. *State v. Phillips,* 480 S.W.2d 836, 837[2] (Mo.1972); *State v. Tibbs,* 523 S.W.2d 108, 110[1] (Mo. App.1975).

A recognized exception to this rule occurs in a situation where the record shows that no opportunity was afforded the complaining party to voice an objection between the question and a responsive answer because the witness answered so quickly as to preclude the interjection of the objection or for some other reason apparent on the record. *State v. Simmons,* 500 S.W.2d 325, 328–329[2–6] (Mo.App.1973). When such a trial situation develops, the proper procedure is to voice the objection at the earliest

possible opportunity and move to strike the answer. In the absence of such a motion to strike, the ruling of the trial court is not preserved for review. *State v. Taylor,* 408 S.W.2d 8, 11[8] (Mo.1966); *State v. Velanti,* 331 S.W.2d 542, 546–547[7] (Mo.1960).

■ This record is absolutely devoid of any indication of lack of opportunity for defense counsel to object to the question before Detective Theisen's answer. To the contrary, after the answer was given, defense counsel stated he had no questions, the witness was excused, and the jury admonished and excused for a recess. Only then, did defense counsel voice his objection and move for a mistrial. No motion to strike the answer or request that the jury be instructed to disregard it was made. Upon this record, the objection was untimely and preserved nothing for appellate review. The defendant's first point is ruled against him.

■ The defendant offered three instructions on the issue of burden of proof of identification, and assigns as error the court's refusal to give them.

These instructions were in the following form:

### "INSTRUCTION NO. A

One of the most important issues in this case is the identification of Kenneth Peterson as the perpetrator of the crime. The state has the burden of proving identity beyond a reasonable doubt. If after examining the testimony, you have a reasonable doubt as to the accuracy of the identification you must find Kenneth Peterson not guilty.

### INSTRUCTION NO. B

The jury must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict him. If you are not convinced beyond a reasonable doubt that Kenneth Peterson was the person who committed the assault or that he acted with others in committing the assault, you must find the defendant not guilty.

### INSTRUCTION NO. C

One of the most important issues in this case is the identification of Kenneth Peterson as the perpetrator of the crime. The burden of proof of the prosecutor extends to every element of the crime charged and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of this crime for which he stands charged. If, after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty."

In connection with these proffered instructions, it should be noted that they are not included in MAI–CR and their source is not delineated; they all cover the same theory of defense on burden of proof as to identification, and accordingly, at best, the defendant would be entitled to only one of them; and, they are strictly cautionary in nature. More importantly, however, they do not properly declare the law under the circumstances of this case. They are based upon the recurring hypothesis that, if the jury entertained a reasonable doubt as to the identification of defendant by Roberta Hodges, the jury was required to acquit. Thus, the instructions completely overlook the circumstantial fact that the defendant's automobile was used in the Altman robbery and the shot constituting the assault upon Officer Kerfoot was fired by someone within the car. Further, they overlook the incriminating statements made by the defendant to Detective Dawson. In other words, if the jury did not believe the defendant's alibi but accepted the fact of his ownership of the automobile and his incriminating statements, they were authorized to convict, although some reasonable doubts were entertained as to the accuracy of Roberta Hodges' identification. The instructions, therefore, must be faulted as containing misdirection.

Decisive to the resolution of this point, however, is the fact that the jury was fully instructed on all elements of the offense charged in the state's verdict director Instruction No. 8, and the burden of proof Instruction No. 4. In addition, the court

gave Instruction No. 9, MAI–CR 3.02, as follows:

"If you do not find and believe from the evidence beyond a reasonable doubt that Kenneth Peterson was present at the scene and, either alone or acting in concert with others, assaulted Officer Kerfoot, then you must find the defendant not guilty."

and Instruction No. 11, MAI–CR 3.20, as follows:

"One of the issues in this case is whether Kenneth Peterson was present at the time and place the offense is alleged to have been committed. On that issue, you are instructed as follows:

1) The state has the burden of proving beyond a reasonable doubt that Kenneth Peterson was present at the time and place the offense is alleged to have been committed.

2) If the evidence in this case leaves in your mind a reasonable doubt regarding Kenneth Peterson's presence at the time and place the offense is alleged to have been committed, then you must find Kenneth Peterson not guilty."

■ It is well-settled law in this state that when a court has fully and properly instructed on a subject, there is no error in refusing further instructions on the subject. *State v. Taggert,* 443 S.W.2d 168, 175–176[14] (Mo.1969), (identification instruction refused in a rape case); *State v. Neal,* 514 S.W.2d 544, 547–548[1, 2] (Mo. banc 1974), (instruction on burden of proof, presumption of innocence and reasonable doubt refused in burglary case); cases collected in 9A Mo. Dig. Criminal Law, Section 829(1).

This rule is thus stated in *State v. Smith,* 358 Mo. 1, 212 S.W.2d 787 (1948), a first degree robbery case where the matter of identification was the paramount issue. The defense was alibi. The trial court refused an instruction offered by the defendant which singled out the question of identification. In affirming a conviction on this point, the court said, l. c. 789[3]:

"The main instruction required the jury to believe beyond a reasonable doubt that

defendant committed the robbery. That was sufficient, and fully protected defendant on the issue of identification. Unless the jury believed beyond a reasonable doubt that the defendant was the person who committed the robbery it could not have found him guilty under that instruction. * * *"

■ Even had defendant's Instructions A, B and C in this case been properly drafted, they were cautionary in nature. The giving or refusal of cautionary instructions is always discretionary with the trial court, *State v. Bibbs,* 461 S.W.2d 755, 760[7] (Mo. 1970). No abuse of this discretion in the refusal of Instructions A, B and C appears on this record. The defendant's second point is ruled against him.

■ Before any evidence was introduced at the trial of this case, the defendant presented and argued to the court his motion to dismiss the charge of assault upon Officer Kerfoot. The basis for this motion was that the defendant had been tried in August, 1975 (a month before the present trial) under a separate indictment, charging him with first degree robbery arising from the robbery of Altman's and he was found guilty of that charge. At that trial, the court admitted some evidence of the assault upon Officer Kerfoot and the defendant argued that the admission of such evidence placed him in jeopardy on the assault charge, and to permit the instant case to proceed, violated his constitutional rights under the Fifth Amendment. The court below overruled the motion to dismiss and such ruling is urged as error here under the defendant's third point.

It should be noted that at the time the motion to dismiss was argued to the court below, the robbery conviction was pending on a motion for a new trial. The motion for a new trial was subsequently overruled and the defendant was sentenced by the court to fifty (50) years in the penitentiary. This conviction was appealed to this court and affirmed on November 4, 1976, *State of Missouri v. Kenneth S. Peterson,* 543 S.W.2d 566. In that appeal, the sole point

raised by the defendant was that the court erred "in admitting evidence of the assault of Officer Kerfoot" since such evidence "was proof of a separate and distinct crime." This court in the opinion of November 4, 1976, adopted this analysis but held that the evidence of the assault was relevant to the issues presented on the robbery charge and was therefore admissible.

Since the charge of assault here involved was a separate and distinct crime from the robbery charge, the state had the right to seek separate indictments and conduct separate trials without exposing the defendant to double jeopardy.

In the case of *State v. Cline,* 477 S.W.2d 91, 94[3] (Mo.1972), the rule is thus stated:

> "Before a defendant may successfully plead double jeopardy, he must show he was prosecuted *for the same offense* after prior acquittal, a second prosecution *for the same offense* after prior conviction *for that offense,* or multiple punishments." (Emphasis added)

In *State v. Glover,* 500 S.W.2d 271, 273[3] (Mo.App.1973), it is stated:

> " * * * 'The test is the *identity of the "offenses", offenses identical in law and in fact'. State v. Bowles,* 360 S.W.2d 706, 707 (Mo.1962)." (Emphasis supplied)

The charges against the defendant do not in any particular meet these tests, and his third point is ruled against him.

The judgment is affirmed.

All concur.