**STATE of Missouri, Plaintiff-Respondent,**

v.

**Thomas Edwin JOHNSON, Defendant-Appellant.**

**No. 10547.**

Missouri Court of Appeals, Southern District, Division One.

March 21, 1979.

Motion for Rehearing or to Transfer Denied April 19, 1979.

Application to Transfer Denied May 17, 1979.

Michael Baker, Springfield, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Stanley Robinson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before FLANIGAN, P. J., TITUS, J., and MOORE, KENNEDY, PYLE and CAMPBELL, Special Judges.

WELDON W. MOORE, Special Judge.

This is an appeal from a judgment and sentence of life imprisonment, upon a jury verdict of guilty of first degree murder.

The facts of the offense are singularly free of complication and dispute. In the late afternoon of May 12, 1968, the defendant shot the decedent Woods through the head with a .22 caliber rifle. The decedent Woods was emerging from the door of his quarters in the Rainbow Gardens Motel in

Springfield where he resided with his wife and children, and of which he was the manager. The defendant Johnson also resided in the motel with his wife and a child.

The homicide was witnessed by the decedent's wife and a Mrs. Evans, another resident of the motel, who were talking with each other outside the motel. They were apparently looking toward the door where the decedent emerged, heard the shot, and saw the decedent fall. Looking toward the sound of the shot, they saw the defendant standing outside his quarters in front of his pickup truck, lowering a gun. As decedent's wife rushed to her fallen husband, and as Mrs. Evans went to call the police, the defendant turned and entered his living quarters with the gun.

The incident was preceded by no recent altercation or encounter of any kind between the defendant and the decedent. Three or four weeks earlier the decedent Woods had intervened during an assault by defendant Johnson upon his wife, and at that time defendant had said that he "ought to shoot him and her both."

The police arrived shortly at the scene. Defendant was found standing inside his living quarters. The rifle was leaning against the television set. Defendant was placed under arrest. He appeared to have been drinking but not to be intoxicated. The arresting officers agreed he seemed confused and disoriented. "He didn't really act like he understood exactly what was going on" said one. An officer later returned and found a spent rifle shell on the floor of the apartment.

The defendant's brief testimony was that he was unable to remember shooting the decedent. He remembered having put the gun, unloaded, in his pickup truck on Friday night. There were shells in the glove compartment. He remembered being at his father-in-law's house in Buffalo on Saturday, and remembered being on Jefferson Street (not the address of the motel).

Besides the testimony of the defendant Johnson, defendant's case consisted of the testimony of two psychiatrists who gave it as their opinions that the defendant suf-fered from paranoid schizophrenia at the time of the offense, and could not appreciate the nature, quality, or wrongfulness of his conduct, and could not conform his conduct to the requirements of the law. The state presented no rebuttal evidence.

Defendant's brief contained eleven points relied on.

■ Defendant's first point is that the court erred in overruling his motion to suppress evidence concerning the .22 rifle and the .22 shell casing because of an unreasonable search and seizure. The police officers had a right to enter defendant's apartment to arrest him. *State v. Johnson*, 463 S.W.2d 785 (Mo.1971). The rifle was in plain sight and could be seized by the arresting officer. *State v. Hawkins*, 482 S.W.2d 477 (Mo.1972). The .22 caliber shell was found by an officer on a later visit to the apartment of the defendant and it was the testimony of the officer that the wife of the defendant, who lived with defendant in the apartment, consented to the search. The court had the right to believe this testimony and she could give valid permission to search the said premises. *State v. Stuart*, 415 S.W.2d 766 (Mo.1967). Point one is ruled against defendant.

■ Defendant's point two is that the court erred in overruling his motion to dismiss the information because he had previously been acquitted by reason of mental disease or defect. The proceedings which resulted in the acquittal of January 11, 1971, found later to be invalid, did not put defendant in jeopardy of being found guilty. Therefore the present trial does not constitute double jeopardy. *State v. Kent*, 515 S.W.2d 457 (Mo.1974); *U. S. v. Lasater*, 535 F.2d 1041 (8th Cir. 1976). Point two is ruled against defendant.

■ In defendant's point three he claims he is entitled to be discharged because there has been an unreasonable and prejudicial delay in bringing him to trial and the court erred in denying his pre-trial motion for that relief.

Since eight and one-half years passed from the time of the offense to the time of trial, a detailed procedural history, in both the magistrate and circuit courts, from arrest to trial, is appropriate.

## Magistrate Court Procedure

On May 13, 1968, a felony complaint was filed, a warrant was issued and served on defendant. Defendant was arraigned and preliminary hearing was set for May 28, 1968. Defendant was advised that the court would, on May 15, 1968, consider appointing attorney for preliminary hearing. On May 15, 1968, an attorney was appointed for defendant. On May 21, 1968, he filed a motion for mental examination of defendant, which was sustained on May 29, 1968.

Defendant was examined by Dr. T. William Howard on June 5, 1968, and was further examined by Dr. James B. Allison on June 12, 1968. Defendant was also examined at St. John's Hospital on June 15, 1968.

On June 28, 1968, the prosecuting attorney filed motion for mental examination by Dr. Hulstra which was sustained on July 1, 1968.

On August 21, 1968, a hearing was had and the court, after reviewing the reports of Dr. Hulstra, Dr. Allison and Dr. T. William Howard (in evidence by stipulation) and conferring with the defendant, ordered defendant committed to a mental institution for psychiatric hospitalization.

On August 28, 1969, the state filed objection to release of defendant which was in response to defendant's motion to proceed, which was not filed until August 29, 1969. The prosecuting attorney apparently received a service copy of the motion before it was filed.

Defendant, in his motion, alleged that he was committed to the state hospital until he had the capacity to understand the proceedings against him; that he had been staffed by the professional staff; that he felt that he had the capacity to understand the proceedings against him; that he could assist in his defense. He prayed that he be returned to the jurisdiction of the court. The motion was overruled.

On September 21, 1970, a motion to proceed was filed by the director of mental diseases and was sustained on October 7, 1970. On October 14, 1970, by agreement of the prosecuting attorney and attorney for defendant, the case was reset for November 5, 1970.

Preliminary hearing began on November 5, 1970, and ended November 6, 1970. Defendant was bound over to the circuit court for its action on November 13, 1970.

## Circuit Court Procedure

On November 10, 1970, an information was filed charging defendant with first degree murder. November 12, 1970, defendant filed motion for examination pursuant to Chapter 552 RSMo 1963 Supplement.

On November 16, 1970, defendant was arraigned and entered pleas of not guilty and not guilty by reason of mental disease or defect. Defendant's motion for examination pursuant to Chapter 552 RSMo was sustained. Dr. James Allison and Dr. Han Hulstra were appointed to examine defendant.

On December 31, 1970, defendant appeared with a different attorney and the state declined to accept a plea of not guilty by reason of mental disease or defect excluding responsibility. The case was set for trial February 8, 1971.

On January 11, 1971, defendant again appeared with his attorney and state appeared. A supplemental report of Dr. Hulstra was filed. State accepted a plea of not guilty by reason of mental disease or defect excluding responsibility. Court found defendant not guilty by reason of mental disease or defect. The court found defendant was still suffering from the disease or defect and ordered him committed to the custody of Director of Mental Diseases of Missouri, Department of Health, at State Hospital No. 1.

Defendant filed petitions or applications for order of release on July 15, 1971, January 14, 1972, March 14, 1973, April 22, 1974, and December 23, 1974.

Five hearings were held between July 12, 1972, and March 21, 1975, on the petitions or applications for release and release was denied each time.

On March 10, 1976, the Supreme Court of Missouri ordered defendant released from the State Hospital at Fulton because the original commitment to the hospital was invalid for "failure to follow the provisions of Section 552.030.2, RSMo. 1969." Defendant was ordered into the custody of the Sheriff of Greene County to be held for further proceedings on the criminal charges.

On March 19, 1976, an attorney was appointed to represent the defendant and the court announced its readiness and intention to proceed with trial as soon as possible, if and after the court determines defendant is mentally able to proceed and the state can make a submissible case. On April 15, 1976, after a hearing, the court found that defendant was mentally competent to proceed and the state could make a submissible case.

Trial was set for June 6, 1976. On May 17, 1976, the court, over the objection of the defendant, sustained the state's motion for a continuance and the case was reset for July 14, 1976.

On July 8, 1976, the defendant filed two motions to suppress. On July 14, 1976, defendant filed a motion to view the scene of the alleged offense. Hearings were conducted on these motions on July 14 and July 15, 1976.

Defendant was tried on October 18 and 19, 1976.

In *State v. Hadley*, 249 S.W.2d 857 (Mo. 1952) defendant entered a plea of guilty to murder in the first degree and was sentenced and was confined from March 1930 until December 1949, when his plea and the judgment rendered thereon was vacated for want of counsel. Defendant was indicted for the same offense on February 3, 1950, and on May 6, 1950, was again found guilty. It was held that defendant was not denied a speedy trial since there had been no delay by the state in the sense that the state was slow or reluctant to prosecute, but that the delay was due to an error in the record of the first proceeding.

In *State v. Brown*, 502 S.W.2d 295 (Mo. 1973) cert. den. 416 U.S. 972, 94 S.Ct. 1999, 49 L.Ed.2d 562, the indictment was filed on April 27, 1965, and was not tried until after March 10, 1970. Defendant contended that the court erred in overruling his motion for discharge because he was denied his constitutional right to a speedy trial. Defendant, on August 27, 1965, filed a motion requesting a mental examination, which was sustained. The examination found defendant incompetent to stand trial and he remained in that status until he was deemed competent by a hearing of January 8, 1969. Defendant cited and relied on *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). It was held that *Barker v. Wingo* does not apply where a delay resulted from lack of mental capacity of an accused to stand trial. The court cited *Genereux v. Pelosi*, 96 R.I. 452, 192 A.2d 630 (1963) where it is stated "[i]f the accused himself has put in issue his mental capacity to stand trial it has been held that he cannot thereafter claim that either his constitutional or statutory right to speedy trial has been violated." The court cited *Howard v. United States*, 261 F.2d 729 (5th Cir. 1958), relying on *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956) held that the failure to put an accused to trial because of mental incompetency does not deprive him of the right of a speedy trial under the guarantee of the Sixth Amendment to the Constitution of the United States.

Here defendant put his mental capacity to stand trial in issue in both the magistrate and circuit courts. Defendant initiated an offer to plead not guilty by reason of mental disease or defect which the state refused to accept. Later the state did accept such plea and defendant was committed to State Hospital No. 1 on January 11, 1971. The Supreme Court of Missouri ordered defendant released on March 10, 1976, and the defendant was tried in October 1976.

After it was determined that defendant lacked the requisite mental capacity to

stand trial and after defendant's plea of not guilty by reason of mental disease or defect had been accepted, the state could not try him so long as those conditions existed. "[T]he conviction of an accused person while he is legally incompetent violates due process.'" *Brown v. State*, 485 S.W.2d 424 (Mo.1972). From August 21, 1968, until at least March 10, 1976, defendant was not legally competent to stand trial except for that brief period from October 14, 1970, to January 11, 1971, during which the defendant had his preliminary hearing and initiated his plea of not guilty by reason of mental disease which the state accepted. When the period of mental incompetency to stand trial is not considered, defendant's right to a speedy trial is not violated. See *Miller v. State*, Fla., 332 So.2d 65.

Here it was the defendant who initiated the mental examination and it was the defendant who apparently initiated the plea of not guilty by reason of mental disease. The court was always open to the defendant and he had several hearings pertaining to his status. The state was not slow or reluctant to proceed on the various motions filed by the defendant, nor was the state slow or reluctant to afford defendant a jury trial once his mental competency was established. Point three is ruled against defendant.

Defendant's fourth point is that the information should have been dismissed for the reason that the statute upon which it was based had been repealed.

The fact that the statute upon which the information was based and which was in effect at the time of the homicide had been repealed before the trial does not entitle defendant to the dismissal of his information. Section 1.160 RSMo 1969. Point four is ruled against defendant.

Defendant's point five is that the court erred in overruling his objections to and motion for mistrial based on questions concerning threats allegedly made by him to the decedent for the reason it deprived him of his right to be tried on the crime charged. There was no error in admitting testimony that the defendant, three or four weeks before the shooting, had made what could be considered a threat to shoot the decedent. This is admissible testimony even though it might prove another crime. *State v. Whitley*, 512 S.W.2d 840 (Mo.App. 1974). The testimony is plainly relevant to show motive, deliberation and state of mind. Defendant's fifth point is ruled against defendant.

Defendant's sixth point is that his motion for judgment of acquittal should have been sustained for the reason that the evidence showed that he was suffering from a mental disease or defect so as to exclude from responsibility. A criminal defendant is presumed to be free of mental disease unless defendant introduces substantial evidence of lack of responsibility, whereupon the matter becomes one for the trier of facts. *State v. Bacon*, 501 S.W.2d 499 (Mo.App.1973). The question of defendant's lack of responsibility was for the jury. Point six is ruled against defendant.

Defendant's seventh point is that the charges should have been reduced to second degree murder because the evidence established he was not capable of forming the intent required for first degree murder and the state failed to show such state of mind. The evidence, which has been recounted in this opinion, plainly shows that the evidence was sufficient to support an instruction upon the subject and a verdict of first degree murder. Defendant's point seven is ruled against defendant.

Defendant's points eight and ten complain of giving of certain instructions. He claims that the court's first degree murder instruction requiring a finding that defendant "intended to take the life of Glen Dale Woods" and the second degree murder instruction requiring a finding that defendant "intended to cause serious bodily harm to Glen Dale Woods" was confusing. We are unable to say this is so. Defendant's points eight and ten are ruled against defendant.

Defendant's point nine is that the court erred in failing to give a certain in-

struction offered by defendant which told the jury that if the defendant was unable, because of mental disease or defect, to form the specific intent required by a certain crime or degree of crime then he must be found not guilty of the crime because of lack of specific intent. The court did, however, give two other instructions to the same effect, also offered by the defendant. Neither the two instructions which were given nor the refused instruction are in MAI. When a court has fully and properly instructed on the subject there is no error in refusing further instructions on the subject. *State v. Peterson*, 546 S.W.2d 175 (Mo.App. 1976). Point nine is ruled against defendant.

Defendant's point eleven is that the court erred in admitting into evidence photos of the body of the decedent. The trial judge viewed the photos and allowed them to be introduced. Proof of the decedent's death was an essential part of the state's case. This is one of those matters entrusted to the discretion of trial judges and we find no abuse of discretion. *State v. Jackson*, 499 S.W.2d 467 (Mo.1973). Point eleven is ruled against defendant.

The judgment is affirmed.

FLANIGAN, P. J., TITUS, J., and PYLE and CAMPBELL, Special Judges, concur.

KENNEDY, Special Judge, dissents.

DON W. KENNEDY, Special Judge, dissenting.

I dissent. I think the passage of eight and one-half years from the time of the alleged crime and arrest to the time of the first trial was presumptively prejudicial to defendant and in violation of his right to a speedy trial. I would reverse and remand for further proceedings upon the motion for discharge, and I would place upon the state the burden of showing that the defendant suffered no intolerable disadvantage for the delay. See *Williams v. United States*, 102 U.S.App.D.C. 51, 53, 250 F.2d 19, 21 (1957). Here are my reasons:

Eight and one-half years passed from the time of the assumed crime, followed immediately by defendant's arrest, until the trial which resulted in his conviction. Such an extraordinary interval raises inevitably the speedy trial question and entitles it to the closest examination.

The right to a speedy trial is vouchsafed to the defendant by Article I, Section 18(a) of the Missouri Constitution of 1945. It is also one of those fundamental rights imposed upon the states by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967).

The fundamental interests served by these constitutional provisions have been discussed by the Supreme Court of the United States in the case of *Barker v. Wingo*, 407 U.S. 514, 519–522, 92 S.Ct. 2182, 2186–2188, 33 L.Ed.2d 101, 110–112 (1972). The reader is referred to that opinion for amplification of the philosophy of the speedy trial requirement and I will resist the temptation to quote from it at length. The opinion points out that it is not only the obvious interests of the defendant which are served by a reasonably prompt trial of criminal charges. *Society* also has an interest which exists "separate from, and sometimes in opposition to" the interests of the accused.

In discussing criteria for permissible and impermissible delay in trial, the supreme court observed that some courts had held that a defendant waived a right to a speedy trial by failing to demand same, and that other courts and legislatures had prescribed a certain time period within which the defendant must be offered a trial. The opinion proceeds (407 U.S. at 529–530, 92 S.Ct. at 2191–2192, 33 L.Ed.2d at 116, 117):

"We . . . reject both of the inflexible approaches—the fixed-time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed fundamental. The approach we accept is a balancing test, in which the conduct of both the prosecution and the defendant are weighed.

"A balancing test necessarily compels courts to approach speedy trial cases on an ad hoc basis. We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right. Though some might express them in different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."

Now to the case before us:

The charge-to-trial period is divided as follows:

3 months—In jail pending preliminary hearing. Two mental examinations conducted.

27 months—In state hospital pending preliminary hearing as incompetent to stand trial.

2 months—In jail and in state hospital from preliminary hearing to judgment of acquittal and commitment to state hospital (January 11, 1971).

62 months—In Fulton State Hospital under January 11, 1971 judgment, until discharge on habeas corpus.

7 months—In jail awaiting trial.

The five periods total eight and one-half years, during all of which defendant was incarcerated, either in jail or in the state hospital.[1]

The greater part of the delay is accounted for by two periods of confinement in the state hospital—the first of twenty-seven months because incompetent to stand trial, and the second of five years and two months under the abortive judgment of acquittal and hospital commitment.

The earlier hospital confinement of twenty-seven months is to be weighed differently from the later confinement. If the case was in abeyance during this period there was at least a trial in prospect. It languished but it was not dead. It was likely under occasional review by prosecutor, by defense counsel and by the court. For this reason the time should be weighed less heavily against the state than the time during the second period, but it should not be excluded from consideration.

Delay because of the incompetency of an accused to stand trial may sometimes reach a point when a case ought to be dismissed. *Williams v. U. S.*, 102 U.S.App.D.C. 51, 55, 250 F.2d 19, 23 (1957).[2] Aside from the constitutional issue, our statute recognizes that eventually it may be unjust to resume the prosecution and provides for its dismissal, § 552.020(7), RSMo 1969. (Such time is excluded, however, in applying the statutory 180-day period in which a criminal charge must be tried under our new § 545.-780, RSMo, enacted in 1977).

The second period of sixty-two months, however, should be given greater weight on the side of the motion for discharge. During this period the case was considered by all to be finally disposed of and dead. Neither any prosecutor nor any defense attorney was looking toward a trial of the case. No investigation was proceeding, no evidence being preserved, no discovery in progress. It may be worth noting under the heading of absence of continuity, that the defendant's first attorney was replaced by another before the acquittal of January 11, 1971. Yet a third attorney represented him in the present trial. A fourth and fifth had represented him on his petitions for release. A number of prosecutors had represented the state. All the defendant's attorneys acted under court appointment.

The remainder of the eight and one-half year period is accounted for by twelve months in jail in three different segments.

1. See *United States v. Sarvis*, 173 U.S.App.D.C. 228, 233, 523 F.2d 1177, 1182 (1975) to the effect that incarceration of defendant pending trial is a factor to be considered on speedy trial issue—and in our case the factor is not mitigated by defendant's receiving credit for it on his penitentiary sentence!

2. In *Williams*, a seven-year delay, occasioned largely by his mental incompetence to stand trial, was held to entitle defendant to discharge. See also *U. S. v. Morgan*, 185 U.S.App.D.C. 372, 390–91[12], 567 F.2d 479, 497–98[12] (1977) where in dicta the court seriously questioned whether an effective insanity defense could be presented after six years.

Only one part of the whole lapse of time might be considered the "fault" of the state. That was the final seven-month period before the trial, which seems inordinate in the circumstances of this case. During that time one continuance was granted, from a July setting. It was at the state's request and over the defendant's objection. Of course, any delay which is intentionally or negligently caused by the state should be weighed more heavily against the state.

No part of the delay can be laid to the defendant, for aught the record shows. Delay attributable to defendant's fault is to be excluded from consideration upon the speedy trial issue. If delay is purposefully used as a defense tactic it cannot be used also in support of a plea for discharge because of denial of a speedy trial. But in this case there is no hint of that on defendant's part. The reasons for the delay were (with possible exception mentioned above) of a "neutral" variety. *Barker v. Wingo*, supra, 407 U.S. at 534, 92 S.Ct. at 2194, 33 L.Ed.2d at 119.

It might be argued, on the basis of *State v. Hadley*, 249 S.W.2d 857 (Mo.1952) that the courts were open to the defendant during the sixty-two month period of confinement, and that he could at any time have secured his release from the state hospital and have gotten a trial—the "relief" which he ultimately got. But this is more theoretical than practical. And you might as well argue the state at any time could have had the 1971 acquittal set aside and have put the defendant upon trial. After all, it is ultimately the responsibility of the state to provide a speedy trial, not that of the defendant. *Barker v. Wingo*, supra, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *U. S. v. Sarvis*, supra, 173 U.S.App.D.C. at 234, 235 at 1183, 1184.

But regardless of the absence of culpability on the state's part—and bearing in mind that the defendant also was innocent of blame for the delay—I think the mere passage of time in this case probably has materially diminished the defendant's ability to establish a defense of mental disease or defect excluding responsibility.

It is quite evident that defendant's only defense was mental disease or defect barring responsibility. It is also clear that it was a substantial defense. While we have the trial testimony only of Dr. Allison and Dr. Hulstra, I infer that the several doctors who examined defendant in connection with his various petitions for release had found him mentally ill at the time of examination, for his petitions were regularly denied. The magistrate court originally found the defendant mentally incapable of trial, and the preliminary hearing was held only after defendant had been twenty-seven months in a mental hospital. Although the January 11, 1971, commitment by the trial court was later determined to be invalid, the prosecuting attorney at the time of that commitment did agree that the defendant was not guilty by reason of mental disease and defect barring responsibility, and the court accordingly acquitted the defendant and committed him to the state hospital. It appears from the record that the state would have been willing before the present trial to accept a plea of not guilty by reason of mental disease or defect, but the defendant would not agree to it. The claim of mental disease or defect was no sham defense.[3]

A persuasive defense of mental disease excluding responsibility usually must be established by more than psychiatrists' testimony based upon after-the-fact examinations. Testimony of aberrant behavior and speech over a period of time, gathered usually from friends, family, neighbors, employers and fellow workers, may be pieced together to form a history showing a deranged mind. Such data is useful to the psychiatrist in his diagnosis and it is useful also to the jury in raw form. These bits

3. Defendant was reluctant for the court before the present trial to enter a plea of not guilty by reason of mental disease or defect. "I'd like to get out from under that plea myself," defendant said, "because that plea was made to me by— without my knowing anything about it, you see . . . . I feel that this is too much of a plea there." Defendant's I.Q. was measured after the killing to be 64 (that of a 10-year-old child). Later it was measured as 88, a dull normal.

and pieces of information, each in itself of small significance, are more than likely lost over a period of eight and one-half years.

Not all the disadvantage stemming from the delay belongs to the defendant. The state's task of producing evidence in rebuttal of defendant's testimony of mental disease or defect is made more difficult, if not impossible. The whole process of investigating defendant's mental condition as of a date eight and one-half years in the past, at least in the circumstances of this case, becomes a mighty uncertain business.

"When prosecution is delayed because of an accused's mental incapacity to stand trial, the difficulty of determining whether the accused was mentally responsible at the time of the crime is increased. Passage of time makes proof of any fact more difficult. When the fact at issue is as subtle as a mental state, the difficulty is immeasurably enhanced." *Williams v. U. S.*, supra, 102 U.S.App.D.C. at 54-55, 250 F.2d at 22, 23.

My treatment of this sixty-two month period is inconsistent with *State v. Hadley*, supra, where trial took place twenty years after offense and charge. During nearly all that time defendant had been in prison under a sentence based upon a guilty plea which was at length set aside because defendant had not been represented by counsel. The case is distinguishable from this in that there was no insanity defense, calling for a wide-ranging investigation—but I am dubious about the authority of the case, anyway, since *Barker v. Wingo*, supra. The case seems to me an anachronism.

Except for *Hadley*, I have found no case which survived a speedy trial challenge where the *first* trial occurred anything like eight and one-half years after the offense and charge. Cases such as *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (eight years from indictment to trial) are not in point for there had been an earlier trial. The earlier trial gave an opportunity for thorough investigation and for the preservation of testimony by means of the record.